Carl McSHALL, Petitioner,

v.

Robert J. HENDERSON, Superintendent, Auburn Correctional Facility, Respondent.

No. 81 Civ. 1844–CLB.

United States District Court,
S. D. New York.

Nov. 9, 1981.

---

Carl McShall, pro se.

Robert M. Morgenthau, Dist. Atty., New York County, New York City, Mark Dwyer and Marc Fraizer Scholl, Asst. Dist. Attys., New York City, of counsel, for respondent.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Carl McShall, a state prisoner, filed his petition on March 27, 1981 for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. On May 18, 1981, the District Attorney of New York County filed an answer. Petitioner filed his "Traverse to Answer" on September 3, 1981.

■■ Petitioner has exhausted his state remedies as a result of his direct appeals in the New York State courts, as required by 28 U.S.C. § 2254(b). The petitioner's conviction was affirmed without opinion by the Appellate Division, First Department on September 25, 1980. Leave to appeal to the New York State Court of Appeals was denied on November 10, 1980. In those appeals, petitioner raised the same issues which he raises in this petition.[1]

This Court has been supplied with the brief of the petitioner on appeal before the Appellate Division, and will treat that brief as setting forth petitioner's arguments in this case. The District Attorney of New York County has filed a brief, as well as a copy of the brief of the People before the Appellate Division.

Petitioner's conviction arises out of the fatal shooting of Richard Spivey after 11:00 P.M. on January 18, 1978, by one "Tony," an otherwise unidentified individual who was not apprehended. After a jury trial, petitioner was convicted of second degree murder as the accessory to the murder of Spivey by "Tony." On March 14, 1979, petitioner was sentenced to an indeterminate prison term of from fifteen years to life which he is currently serving.

Petitioner raises three arguments in support of his application for a writ of habeas corpus. First, petitioner contends that the prosecution failed to prove that he was guilty beyond a reasonable doubt, because of the failure of the prosecutor to prove that he shared the principal's intent to cause the victim's death. Second, petitioner contends that he was denied his statutory right to have a question posed by the jury, relating to what inferences could be drawn from petitioner's silence after the principal threatened to kill the victim, answered by the trial judge. Third, petitioner contends that he was denied a fair trial when the court, contrary to New York C.P.L. § 270.-35, refused to discharge a juror who was claiming "illness" after jury deliberations had begun, and grant a mistrial.

■ As to petitioner's first claim, a federal court will grant a writ of habeas corpus to a state prisoner challenging his conviction on the ground of insufficient evidence only if the court, after viewing the evidence adduced at trial in the light most favorable to the prosecution, concludes that no rational trier of fact could have found the petitioner guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Applying this standard to the instant case, this Court holds that there was sufficient evidence at trial to permit a factfinder to conclude that the petitioner had the requisite intent to commit murder

---

1. Respondent claims that petitioner did not exhaust his state remedies because he did not raise the federal constitutional issues presented in the second and third claims in this appeal. Respondent's "Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus," at 19–32. Petitioner did present these constitutional issues in the state courts. Both of these claims, although supported by state law cases, were grounded in the "due process right to a fair trial." "Brief for Defendant-Appellant" before the Appellate Division, at 20, 23.

New York State courts allow ultimate fact pleading. Petitioner told the state courts enough facts to invoke his federal constitutional rights. The exhaustion requirement is not intended to exhaust the litigant; its purpose is to give the state courts a fair chance at the federal constitutional issue. There is no basis to require that a brief contain any talismanic word or words before a federal constitutional claim can be regarded as having been fairly presented to the state court for resolution. To the extent that *Johnson v. Metz,* 609 F.2d 1052 (2d Cir. 1979) may be read to the contrary, we believe that the *Johnson* case and its progeny may be restricted to cases wherein state trial judge misconduct is at issue. See *Daye v. Attorney General of the State of New York,* 663 F.2d 1155 (2d Cir. 1981); *Twitty v. Smith,* 614 F.2d 325 (2d Cir. 1979).

which is sufficient under state law to support the conviction.

The facts stated below were adduced at trial, mostly as a result of the testimony of the only eyewitness to the murder, Gresalee Coleman, Spivey's common-law wife. Some time after 11:00 P.M. on January 18, 1978, petitioner, accompanied by a second man known only as "Tony," who was never apprehended, went to the Manhattan apartment of Richard Spivey. Ms. Coleman had been acquainted with petitioner for five years. She referred to him by his unusual nickname "Peepsight." She was aware that her consort, the victim of the crime, owed petitioner $700.[2] Ms. Coleman agreed to let petitioner enter the apartment, but she said that "Tony," whom she did not know, could not enter. Petitioner replied that "Tony" was "all right" and was petitioner's friend. Ms. Coleman then relented and allowed both to enter the apartment.

Meanwhile Spivey had hidden himself in a closet. Upon entering the apartment petitioner and "Tony" each drew guns. Petitioner asked where Spivey was. Ms. Coleman replied, untruthfully, that Spivey was not at home. Petitioner then searched the closets and discovered Spivey. Petitioner ordered Spivey to get dressed and asked him where petitioner's money was. Spivey said that he didn't have the money because he had just been released from prison but he promised to get it. Ms. Coleman protested on her husband's behalf. Petitioner ordered "Tony" to "shut that bitch up." "Tony" then struck Ms. Coleman with the butt of his gun.

Ms. Coleman's testimony as to what occurred next was conflicting. On her first day of testimony, she said that "Tony" threatened to kill both her and her husband and then, as petitioner was turning around, "Tony" shot Spivey. On the second day of her testimony Ms. Coleman said that after "Tony" had threatened to kill Spivey, petitioner nodded his head twice.[3] Shortly thereafter petitioner and "Tony" left the apartment. Spivey died of his wounds.

Based on these facts, a rational factfinder could infer that petitioner and Tony went to Spivey's apartment with the intent of collecting the debt by threats of violence or by duress, or to kill Spivey. A factfinder could also infer that when they learned that Spivey could not or would not pay the money, they decided together that "Tony" should kill him. A reasonable factfinder could find that petitioner, by nodding his head, evidenced the requisite specific criminal intent to counsel, command, induce or procure "Tony" to kill Spivey.

▮ Petitioner is not entitled to a writ of habeas corpus merely because his conviction is based upon circumstantial evidence. Nor does the possible conflict in the testimony of the sole eye witness require that the writ be granted. As long as any competent evidence went to the factfinders from which they could infer guilt beyond a reasonable doubt, the conviction will stand. See *Jackson v. Virginia, supra; United States v. Bombard*, 423 F.Supp. 1245 (S.D.N.Y.1976). Accordingly, petitioner has not satisfied the *Jackson* standard.

▮ Petitioner's second contention is that he was denied his statutory right to have a question of law posed by the jury during deliberations answered by the trial judge. According to New York C.P.L. § 310.30, a jury may request instruction with respect to the law or any other matter "pertinent to the jury's consideration of the case." In response, the court "must give such requested information or instruction as the court deems proper." Determination of the appropriate answer rests within the discretion of the trial court, so long as the answer given does not deprive a defendant of a constitutional right.

---

**2.** At a combined *Wade* and *Sandoval* hearing held before trial, the court ruled that the People's witnesses could not refer to the prior relationship of drug dealing between petitioner and the deceased, nor to the fact that the victim's debt to petitioner resulted from a prior illegal drug sale by McShall to Spivey.

**3.** At the grand jury, Ms. Coleman testified that "Tony's" threat was made after petitioner nodded his head, however, this testimony was not presented at trial.

■ In charging the jury, the trial judge instructed the jury at length in traditional form that for it to find petitioner guilty as an accessory, it must determine beyond a reasonable doubt that he intentionally participated in the murder and that he had the specific criminal intent to murder the deceased. The judge emphasized that petitioner's mere presence when the murder occurred would not, in itself, create criminal liability. After the charge was given, defense counsel twice stated that he found the charge to be "proper," and it was. After some deliberations, the jury requested a clarification of that portion of the charge dealing with possible guilt as an accessory. Defense counsel objected to any elaboration and insisted that the judge merely reread the relevant portion of the initial charge. The judge refused simply to reread the initial charge. Instead the judge informed the jury again of the statutory definition of an accessory, and then explained that to be guilty as an accessory one must intend that the crime be committed and aid in its commission.

The jury later asked for clarification as to whether an individual's "silent complicity [can] be construed as assent" and "if a threat is made by another individual who is accompan[ying] the defendant to the scene of the crime and there is not evidence that the defendant objected to it, is the defendant then criminally liable?" (Tr. p. 259). The judge informed counsel that the request was an invitation to invade the jury's province as factfinder and that, therefore, the court intended not to answer the specific question but to supplement the charges already given. Defense counsel did not object to this decision. The judge told the jury that it had to find both that the petitioner intended the homicide and that he "did something which aided, helped or contributed to [its] commission." (Tr. p. 263).

It is clear that the trial judge acted within the discretion authorized by statute and case law. As the Supreme Court said in *United States v. Bayer*, 331 U.S. 532, 537–38, 67 S.Ct. 1394, 1396–97, 91 L.Ed. 1654 (1947):

"Once the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion. The trial judge, in the light of the whole trial and with the jury before him, may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse. How far any charge on technical questions of law is really understood by those of lay background would be difficult to ascertain, but it is certainly more evident in the living scene than in a cold record .... While many judges would have made a more extended charge, we think the trial court was within its area of discretion in his brevity."

See *United States v. Sacco*, 436 F.2d 780, 783 (2d Cir. 1971).

■ Petitioner's third contention is that he was denied a fair trial when the court refused to discharge a juror and grant a mistrial despite that juror's claimed "illness," after jury deliberations had begun. New York C.P.L. § 270.35 requires discharge of any juror "unable to continue serving by reason of illness or other incapacity ...." The statute does not define "illness or other incapacity," so that the words must carry their common everyday meaning. Accordingly, a court must exercise its judgment and discretion in making such a determination.

■ In the case of claimed "illness" based as it was here, on mere anxiety and nervousness, the court is only required to disqualify the juror if there is "clear evidence of a juror's incompetence to understand the issues and to deliberate ...." *United States v. Dioguardi*, 492 F.2d 70, 78 (2d Cir. 1974). See *United States v. Hall*, 536 F.2d 313, 322–23 (10th Cir. 1976).

■ In this case, the juror claimed he was "very nervous." Clearly that "nervousness" stemmed from his role as jury foreman. (Tr. p. 226). "I don't want to be the one to say guilty or innocent, that makes me very nervous." (Tr. pp. 226–27). The trial judge who was in a position to observe the demeanor of the juror, sent the juror back to continue deliberations "in the hope

that he will regain his calm in the absence of the Courtroom." (Tr. p. 229). Later, the juror stated that he felt better. (Tr. p. 244).

During this period of deliberations, another juror served as the *de facto* foreman, and wrote all of the notes written to the court during the trial. Eventually, the court substituted this juror as the foreperson. (Tr. p. 262). On this record, it does not appear to have been an abuse of judgment or discretion for the trial judge to find that the juror claiming nervousness was capable of understanding and deliberating and therefore not incapacitated so as to require discharge and a mistrial.

For the foregoing reasons, the petition for a writ of habeas corpus is denied.

The Clerk shall enter a final judgment.

So Ordered.