**UNITED STATES of America, Appellee,**

**v.**

**Alberto PENA, Juan Urena,**
**Defendants-Appellants.**

**Nos. 663, 666, Dockets 85–1361, 85–1372.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1986.

Decided June 19, 1986.

Robert J. Anello, New York City (Obermaier, Morvillo & Abramowitz, P.C., New York City, of counsel), for defendant-appellant Alberto Pena.

Lawrence A. Urgenson, New York City (Anderson, Laino & Urgenson, P.C., New York City, of counsel), for defendant-appellant Juan Urena.

David Spears, Asst. U.S. Atty., S.D.N.Y. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Warren Neil Eggleston, Asst. U.S. Atty., of counsel), for appellee.

Before FEINBERG, Chief Judge, and FRIENDLY * and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Alberto Pena and Juan Urena appeal from convictions on one count of conspiracy to distribute heroin and cocaine, 21 U.S.C. § 846, and one count of distribution of heroin, 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), resulting from their participation in a drug-selling operation based in a Manhattan restaurant. On appeal, both appellants contend that certain remarks made by the prosecutor during summation deprived them of a fair trial. Also, Pena contends that he was not brought to trial within the time limits established by the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.* We affirm.

## BACKGROUND

The criminal charges at issue in this case grew out of two independent undercover investigations of narcotics sales at Elena's Restaurant, a small eatery located on Avenue B in Manhattan's Lower East Side. The government's proof at trial consisted primarily of testimony about two undercover drug purchases at Elena's, one by a New York City officer and the other by a special agent of the Drug Enforcement Administration ("DEA"). The government also presented evidence that the two transactions were part of an ongoing operation involving both defendants in which "retail" sales of both heroin and cocaine were made.

In November, 1984, DEA informant Manuel Garcia received information that a known heroin dealer was making deliveries to Elena's. On November 20, Garcia went to Elena's, where he met with defendant Juan Urena. Defendant Alberto Pena was also at the restaurant. Garcia expressed an interest in buying some heroin, and Urena introduced him to Sixto and Cesar Caba. The Cabas agreed to sell Garcia one ounce of heroin. Urena was present during these negotiations. That afternoon, Garcia returned to Elena's, and Urena and the Cabas furnished Garcia with a sample of the heroin.

Early that same evening, Garcia returned yet again to the restaurant to pick up the heroin he had previously agreed to buy. DEA Agent Karen Rij accompanied him. Garcia entered the restaurant alone, and returned to Rij's car after being told that the heroin had not yet arrived. The two went back in, and Rij asked Urena and Pena when the package would arrive. Pena stated that it would be there within half an hour. Rij and Garcia left and returned approximately an hour later. Garcia entered and spoke to the defendants, learned that the heroin was ready, and returned to get Rij. Rij entered Elena's and Urena showed her a bag containing a package of white powder. Rij then took Urena to her car, where she gave him $8800 in cash and Urena gave Rij the bag of heroin. Rij and Garcia left the scene, and no arrests were made at that time.

Approximately one month later, an unrelated New York City undercover investigation also found its way to Elena's. On December 18, 1984, undercover officer James Callendar entered the restaurant and made a literally "over the counter" purchase of $80 worth of heroin and cocaine. A woman named Carmen counted out eight $10 bags of drugs while defendant Pena, the only other person on the premises, watched the street, where uniformed officers were patrolling; at one point he warned Callendar to keep the money down below the counter so it would not be seen. Later, Pena helped Carmen count the $80 Callendar had paid. Pena was arrested that day and charged with the sale of the drugs to Callendar. He later plead-

---

* Judge Friendly participated in oral argument in this case and voted before his death on March 11, 1986 in favor of the disposition reached in this opinion.

ed guilty to a felony charge in Supreme Court, New York County.

According to the testimony of Miguel Santana, a cousin of Pena's who testified for the government pursuant to a cooperation agreement, these undercover sales were typical of an ongoing narcotics distribution conspiracy in which both Pena and Urena were participants. The woman named Carmen sold $5 and $10 bags of heroin and cocaine to people who came into the restaurant. Pena and Urena handed the bags of drugs to her as needed, and she gave them the money from each sale.

On January 29, 1985, Pena and Urena were arrested by federal authorities and charged in a complaint with various narcotics offenses. Warrants were also issued for Sixto and Cesar Caba, but neither was apprehended; the Cabas remained at large at the time of argument of this appeal. On February 28, the four were indicted and charged with one count of conspiracy to distribute heroin and one count of distribution of heroin. On May 16, the government obtained a superseding indictment that deleted the Cabas as defendants, lengthened the duration of the conspiracy, expanded its scope to include distribution of cocaine, and added the December, 1984 sale for which Pena had already been arrested as an overt act. Prior to trial, both defendants moved to dismiss the indictment on speedy trial grounds. The district court denied the motion. Trial began on July 15, 1985. The jury convicted Pena and Urena on both counts.

Both defendants now appeal. Pena renews his claim that the extended pretrial period deprived him of his statutory right to a speedy trial. In addition, both defendants claim that certain remarks made by the prosecutor during his summation were so prejudicial as to deprive them of a fair trial.

## DISCUSSION

### 1. *Speedy Trial*

The Speedy Trial Act requires that a defendant's trial begin within seventy days of his indictment or his first appearance before a judicial officer, whichever is later. 18 U.S.C. § 3161(c)(1). The Act provides for the exclusion of certain periods from computation of the seventy day limit. *Id.* § 3161(h)(1)–(8).

In this case, Pena appeared before a judicial officer following his arrest in January, 1985. Viewing his argument in the best light, the February 28 indictment triggered the running of his speedy trial clock. The day after the triggering event is the first to be counted for purposes of the statute, *United States v. Simmons*, 763 F.2d 529, 530 n. 1 (2d Cir.1985), so a total of 137 days passed between February 28 and July 15, the first day of trial. Pena concedes that the period from June 3 to July 15, a total of forty-three days, is properly excludable since several motions were pending during this time. *See* 18 U.S.C. § 3161(h)(1)(F) (excluding delay resulting from any pretrial motion). This exclusion reduces the relevant figure to ninety-four days. Thus, if twenty-five more days were properly excluded from the speedy trial clock, Pena was brought to trial within the required seventy day limit.

Judge Leisure denied defendants' speedy trial motions to dismiss in a thorough opinion read into the record on July 15 before the start of trial. He found several periods of excludable time, and concluded that there was no speedy trial problem. The most important of these exclusions, and the only one relevant for purposes of this appeal, was the seventy-seven day period from February 28 to May 16, the date of the superseding indictment. This time was excluded pursuant to Section 3161(h)(7), which provides for "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(7). Since the Caba defendants were fugitives from the date of the original indictment and were never arraigned, the speedy trial clock never began to run as to them. Noting that any delay attributable to one defendant is also charged to all

codefendants, *see United States v. Piteo*, 726 F.2d 50, 52 (2d Cir.1983), *cert. denied*, 466 U.S. 905, 104 S.Ct. 1682, 80 L.Ed.2d 156 (1984), Judge Leisure thus concluded that the speedy trial clock had been tolled as to all defendants until May 16, when the superseding indictment effectively severed the Cabas from the case.

■ Pena argues that the district court erred in excluding the entire period during which the Cabas were joined as codefendants. Despite Judge Leisure's clear statement that he was excluding the time pursuant to Section 3161(h)(7), most of Pena's argument is focused on Section 3161(h)(3)(A), which allows for exclusion of time because of "the absence or unavailability of the defendant or an essential witness." 18 U.S.C. § 3161(h)(3)(A). He argues primarily that the government did not satisfy its burden under 18 U.S.C. § 3162(a)(2) of showing that the Cabas were unavailable. The government also concentrates primarily on Section 3161(h)(3).

We believe the parties' reliance on Section 3161(h)(3) is misplaced, and that the exclusion of time pursuant to Section 3161(h)(7) was entirely proper. This conclusion follows from our decision in *Piteo*. We held there that: (1) under Section 3161(h)(7), cases involving multiple defendants are governed by a single speedy trial clock, which begins to run with the clock of the most recently added defendant, and (2) delay attributable to any one defendant is charged against the single clock, thus making the delay applicable to all defendants. *Piteo*, 762 F.2d at 52; *see also United States v. Barton*, 647 F.2d 224, 229 n. 5 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. McGrath*, 613 F.2d 361, 366 (2d Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980).

Under the second principle, time is excluded pursuant to Section 3161(h)(7) in conjunction with some other section, such as 18 U.S.C. § 3161(h)(1)(F) (excluding time for motions). Thus, if the Cabas had become fugitives after their indictment and arraignment, and thus after the single clock had started, Section 3161(h)(3) would have governed. However, this case involves only the first concept noted above— the single speedy trial clock applicable to all codefendants. Because the Cabas were never arraigned, under *Piteo* the clock applicable to all defendants did not begin to run.[1] In such cases, the only relevant statutory provision is Section 3161(h)(7), and the only relevant question is whether the delay is reasonable. Of course, a defendant remains free to move for a severance at any time during a period in which his speedy trial clock has not begun to run because a codefendant has not been apprehended.

The legislative history fully supports this interpretation. The Senate Report states that "[t]he purpose of [Section 3161(h)(7)] is to make sure that [the Act] does not alter the present rules on severance of codefendants by forcing the Government to prosecute the first defendant separately or to be subject to a speedy trial dismissal motion under Section 3161." S.Rep. No. 1021, 93d Cong., 2d Sess. 38 (1974). Congress clearly intended that, where appropriate, joint trials of defendants should continue to be available as a means of promoting judicial efficiency by avoiding duplicative proof at successive trials. It thus intended that reasonable speedy trial time be exclud-

---

**1.** The facts of *Piteo* were slightly different, but the differences were legally irrelevant. In that case, the defendant had originally been indicted alone, and a superseding indictment added his sister as a codefendant. 726 F.2d at 51. We held that under Section 3161(h)(7), the joinder of the sister effectively reset defendant's clock to zero, since the controlling clock is that of the most recently added defendant. *Id.* at 51–52. We see no reason why the result should be different where a codefendant is first joined with another defendant as to whom the clock never starts to run but is later dropped by superseding indictment. The net result is the same in either case—the speedy trial clock stands at zero on the date of the superseding indictment, subject to the statute's reasonableness requirement. *Accord, United States v. Dennis*, 737 F.2d 617, 620–21 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 215, 83 L.Ed.2d 145 (1984).

able under Section 3161(h)(7) when necessary to enable joint trials to go forward. *See United States v. Novak,* 715 F.2d 810, 814–15 (3d Cir.1983) (discussing legislative history of § 3161(h)(7) in greater detail), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

Having sorted out the proper legal standard, the only remaining question is whether exclusion of at least twenty-five days because of the Cabas' fugitive status may be deemed to be reasonable. We believe that exclusion of such a period is clearly reasonable. Other cases have held far longer periods excludable under Section 3161(h)(7). *See, e.g., Piteo,* 726 F.2d at 52 n. 1 (delay of two and one-half months held excludable); *United States v. Dennis,* 737 F.2d 617, 620–22 (7th Cir.) (exclusion of two months held "well within" limits of § 3161(h)(7)), *cert. denied,* — U.S. —, 105 S.Ct. 215, 83 L.Ed.2d 145 (1984); *United States v. Varella,* 692 F.2d 1352, 1358 (11th Cir.1982) (exclusion of approximately fifty days under Section 3161(h)(7)), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1392 and 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983); *United States v. Felton,* 592 F.Supp. 172, 184 (W.D.Pa. 1984) (almost one year excluded because one codefendant remained a fugitive) *rev'd in part on other grounds,* 753 F.2d 256 and 753 F.2d 276 (3d Cir.1985). Pena was thus brought to trial within the time required by the statute.

## 2. *Prosecutorial Misconduct*

Both defendants claim that they were prejudiced by comments made by the prosecutor during his summation and rebuttal. They first complain about the conclusion to his summation, in which he reminded the jury that "people who sell heroin are bad people" and that "there is no more worthy aspect of American law enforcement than fighting against life-destroying drugs like heroin." They argue that these statements, when coupled with a prior reference to "the kind of person the defendants are," constituted an improper appeal to the prejudices of the jury. Appellants argue that

they were particularly susceptible to this type of argument, because they are non-English speaking individuals who had to wear earphones at trial while an interpreter translated the proceedings for them.

■ In determining whether a prosecutor's statements require reversal, "[t]he test is whether the statements, viewed against 'the entire argument before the jury,' deprived the defendant of a fair trial." *United States v. Wilkinson,* 754 F.2d 1427, 1435 (2d Cir.) (quoting *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1940)), *cert. denied,* — U.S. —, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). Among the factors to be considered in deciding whether reversal is required are (1) the strength of the government's case, (2) the extent to which the objectionable comments were part of an intentional appeal to prejudice, as opposed to isolated comments made in response to defense contentions, and (3) the extent to which the remarks were cured by the trial court, either by giving cautionary instructions or by striking the remarks from the record. *United States v. Modica,* 663 F.2d 1173, 1181–82 (2d Cir.1981) (per curiam), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).

■ Viewed in light of these standards, we do not believe the prosecutor's comments constituted reversible error. To the extent that the comments were designed to divert the jury from focusing solely on the evidence, they were improper. *See United States v. Barlin,* 686 F.2d 81, 93 (2d Cir. 1982). However, the reference to the kind of people defendants were, when read in context, was a proper response to the defense's challenge to the credibility of Garcia, the DEA informant; the prosecutor defended the use of Garcia by arguing that in order to infiltrate a drug operation, the government has to use the same sort of people as the drug sellers. The implication was that any criticism of Garcia was equally applicable to the defendants. The statements about "bad people" and "life-destroying drugs" also do not merit reversal. After defense counsel objected to these

statements, Judge Leisure immediately instructed the jury that it should base its decision solely on the record, and should not be distracted if "counsel ... get carried away in summation with broader concepts." This instruction was sufficient to remedy any prejudice that might have resulted. Finally, any suggestion that these comments were part of a general ethnic-based attack on the defendants is undercut by the fact that the government's case rested heavily on the testimony of DEA informant Garcia and accomplice Santana, who were, like the defendants, of Dominican extraction.

Defendants' second claim is similarly unavailing. They claim that they were prejudiced when the prosecutor, in alluding to a defense stipulation that Pena had been the male present in Elena's during the undercover sale to the New York officer, stated that Pena had entered into the stipulation because the evidence that he was the man had become too strong. During the cross-examination of Officer Callendar, Pena's counsel had questioned him about his identification of Pena, thus raising the issue of Pena's identity. The government prepared to introduce Pena's arrest as proof that he was the man with whom the officer had dealt, but agreed not to introduce this evidence in exchange for a stipulation that Pena indeed had been the man. We believe the comment on the defendant's motive in entering into the stipulation was improper. However, Judge Leisure immediately instructed the jury that stipulations are entered into solely for the convenience of the parties and the court, and that it, the jury, should not be concerned with whether one side weakened or strengthened its position by stipulating. This instruction was sufficient to obviate any prejudice that might have resulted from the prosecutor's comments.

Defendants' other claims with regard to the summation are without merit.

## CONCLUSION

The judgments of conviction are affirmed.