**Michael MARTIN, Petitioner,**

v.

**Charles J. SCULLY, Respondent.**

**No. 87 Civ. 6954 (RPP).**

United States District Court,
S.D. New York.

Oct. 4, 1990.

---

Michael Martin, Pine City, N.Y., for petitioner.

Stanley R. Kaplan, Asst. Dist. Atty., Bronx, N.Y., for respondent.

### ORDER ACCEPTING MAGISTRATE'S REPORT AND RECOMMENDATION

ROBERT P. PATTERSON, Jr., District Judge.

This Court has received and reviewed the report and recommendation issued by Magistrate Sharon E. Grubin on September 12, 1990 in the above-captioned action. No timely objections to the Report and Recommendation have been received from the parties in this action. The Court has considered the report and agrees with its recommendations. Accordingly, it is hereby

ORDERED that the Report and Recommendation issued by Magistrate Grubin on September 12, 1990 is accepted in accordance with 28 U.S.C. § 636(b). Accordingly, it is further

ORDERED that for the reasons outlined in Magistrate Grubin's Report and Recommendation the petition for habeas corpus is denied.

### REPORT AND RECOMMENDATION TO THE HONORABLE ROBERT P. PATTERSON, JR.

SHARON E. GRUBIN, United States Magistrate:

Petitioner *pro se* seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his March 28, 1985 conviction after a jury trial in the New York State Supreme Court, Bronx County, of murder in the second degree (N.Y.Penal Law § 125.25(3) (felony murder)). He was sentenced to an indeterminate prison term of twenty years to life. The Appellate Division, First De-

partment, affirmed the conviction without opinion on June 17, 1986, *People v. Martin*, 121 A.D.2d 849, 503 N.Y.S.2d 470, and the New York Court of Appeals denied leave to appeal on September 30, 1986, 68 N.Y.2d 815, 507 N.Y.S.2d 1032, 499 N.E.2d 881. The petition pleads the following two issues which were also presented in the Appellate Division brief: (1) whether the evidence was sufficient to prove petitioner's guilt beyond a reasonable doubt; and (2) whether certain comments of the prosecutor during summation denied petitioner a fair trial.

## FACTUAL BACKGROUND

Petitioner's conviction arises from the death of Pasquale Ferrara, who developed peritonitis following surgery for stab wounds to the arm, leg and abdomen. The police discovered his body in an automobile in the middle of the intersection of Kingsbridge Road and Jerome Avenue in the Bronx on the morning of January 1, 1984. He was taken to Jacobi Hospital where he died on January 8, 1984. Construing the evidence at trial in the light most favorable to the state, *see, e.g., Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir.), *cert. denied*, 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 334 (1988); *Garcia v. Warden*, 795 F.2d 5, 6 (2d Cir.1986), the following was established.

The victim's father, Tony Ferrara, testified that on December 31, 1983 his son told him that he was going to a New Year's Eve party with co-workers. When he left the family's Bronx residence to go to the party, he was driving his Cadillac automobile and was wearing his father's diamond-studded wristwatch, a bracelet and his mother's chain necklace.

Co-worker John Carbone also attended the party, which was held at the Chateau Pelham in the Bronx. Ferrara was at the party when Carbone and his wife arrived and they sat at the same table. Carbone also testified that Ferrara was wearing a diamond watch, a bracelet and a rope chain necklace. At about 2:30 a.m. they left the party. Both men were "high" from alcohol, but not intoxicated. In the restaurant parking lot Ferrara mentioned that he was going downtown and then walked toward his automobile.

Apparently Ferrara then drove to Zippers, a bar in New Rochelle. Robert Starke, a bartender at Zippers, testified that the bar was one frequented by homosexuals and that Ferrara entered some time between 2:30 and 3:00 a.m. He was wearing a black suit jacket with a red feather in the lapel, dark pants, a necklace and a wristwatch. He ordered two bottles of champagne which he shared with other patrons and paid for with money from a large roll of bills he took out of his pocket. Starke testified that he talked with Ferrara until 4:30 a.m. at which time Ferrara said he was heading downtown.

At about 7:50 a.m. the same morning, while on routine motor patrol, two police officers, Christopher Arborn and Desmond Jones, discovered Ferrara bleeding and slumped over the steering wheel of his car. The car, with its passenger-side tires slashed, was stopped at a traffic light across the street from the men's shelter located in the West Kingsbridge Armory. The gear shift was in drive and the motor was running. Blood stains were noticeable inside and outside the car. Ferrara was wearing an unbuttoned dress shirt and dark trousers, opened in a manner revealing his undergarments. He was not wearing a wristwatch or any jewelry. A dark suit jacket with a feather in the lapel and a wallet were recovered from the floor in the rear of the car on the passenger side. The officers called for emergency assistance, and Officer Jones testified that before the ambulance arrived, Ferrara identified himself and told Jones that in the bar's parking lot a short, male Hispanic with dark hair and a Van Dyke beard had forced him at knifepoint to enter his car and drive to that location.

Police officers Richard Denaro and John Mendicino arrived at the scene in response to a radio call. They described the scene similarly. Specifically, Denaro testified that Ferrara's white dress shirt was unbuttoned down to the navel or lower and that

his pants were down almost to his knees. He also stated that there was blood all over the back seat of the car, the front seat, the steering wheel and the outside of the rear door. Jones gave Ferrara's wallet and car keys to Denaro. Denaro and Mendicino then followed the ambulance to the emergency room of Jacobi Hospital where they spoke with Ferrara. He told them that an Hispanic male had put him in the back seat, made him take off his clothes and stabbed him.[1]

Witness Alsears Young, a resident at the Kingsbridge Armory men's shelter, testified that at the shelter on the evening of December 31, 1983 at some time between 8:00 and midnight, he overheard a conversation between petitioner and Robert Irizarry who also lived at the shelter.[2] Petitioner said he "was going to get himself a victim;" in response, Irizarry said, "[s]omething like, 'not starting the new year's off broke without no money.'" Tr. 340. At some point petitioner and Irizarry left, and Young next saw them in the morning (see below).

Between 7:30 and 8:00 a.m. on January 1st witness Ciji Adams was inside the men's shelter visiting friends and met petitioner, whom he knew, as petitioner was entering the building. Just a few minutes previously, Adams had heard a gunshot from outside the armory. Petitioner and Adams had a conversation during which petitioner gave Adams $20 in repayment of a loan made three months previously and $20 interest. Adams testified that petitioner, who appeared intoxicated and whose eyes were bloodshot, gave him the $40 from a roll of money he took from his pocket. The money was rolled up with two rubber bands. Adams asked where petitioner had obtained the money, and petitioner responded that he and a friend just "took off" an Italian man they had met up by Bronxwood Avenue in the Bronx. Adams further testified that petitioner had stated that "where they took him off" was

"right down the block." Tr. 143. Petitioner also described to Adams his accomplice in the deed as a "Puerto Rican guy" with "a tail in the back of his head." Tr. 148.

When Adams expressed disbelief at petitioner's admission to this crime, petitioner told him to go outside. Once there Adams saw an ambulance, a paramedic and two patrol cars but did not go over to them to find out what had happened. Prior to Adams' going outside, petitioner handed him a gun, which Adams identified was a .32 caliber, from the left side of the waistband of his pants. Adams testified that he smelled gun powder. He opened the barrel, and saw that five of the chambers contained shells and one chamber contained the casing but no bullet.

About seven minutes later, Adams, who had resided at the armory previously, returned to the inside of the armory. He testified that two police officers walked in and that petitioner went to hide in a dark area in the back of the armory. The officers turned on a light but did not search the armory. Adams did not see petitioner after the officers left.

Alsears Young testified that later that same morning, some time between 9:00 and 10:30, he saw petitioner and Irizarry enter the armory. Petitioner asked if Young knew a place where he could get some money for jewelry, and he specifically mentioned a chain. Young, who had some idea of what had happened, said he told petitioner that he did not want to be bothered with that type of thing. Young also testified that he overheard Irizarry tell petitioner that they should not have "done something close to the armory." Young's direct examination continued as follows:

Q Well, what did Irrizary say that he did?

A About some dude getting bad, him stabbing somebody.

Q Did Martin say anything?

A He grabbed the dude. He yoked the dude.

1. Carbone testified that when he had visited Ferrara in the hospital, Ferrara told him that "three guys" were involved.

2. At the trial, Young described Irizarry as a "Puerto Rican about five-six" who "used to have a lot of hair with a little tail on the back." Tr. 337.

Tr. 344.[3] Young further related that petitioner stated that he was not eating at the armory on January 1st because he had money and that Irizarry stated, "He should have kept the car. He should have kept the car. Could have got some money for it for parts." Tr. 347.

Following interviews with Ferrara, Adams, Starke, Young and others, Detective Edward Blake, who was conducting the investigation of the crime, had the opportunity about seven weeks later to interview petitioner.[4] After being given *Miranda* warnings, petitioner responded to Blake's questioning about what he had done on New Year's as follows. Petitioner told Blake that he had left the armory at 10:00 p.m. to go to the Times Square area to watch the ball drop. Then he went to Bryant Park where he smoked marijuana and drank beer that he had bought. Petitioner next went to 950 Grand Concourse in the Bronx, his brother's apartment, where he was staying, but he found an eviction notice there so he took his clothes and went to his godmother's apartment on East 89th Street in Manhattan, arriving about 5:30 a.m. and slept there until 6:00 p.m. When petitioner finished his description of his night, Blake left the room and telephoned the godmother and after speaking with her confronted petitioner with what the godmother had told him.[5] Petitioner then admitted that he had just lied and told a different story, stating that he had not gone to his godmother's but had gone back to the armory at 8:30 a.m. on January 1st by subway. He had observed an ambulance, a police car and the arrival of another police car when he arrived. He admitted that he was earlier carrying a .22 caliber revolver for protection on 42nd Street; however, he had left the gun, which was not operational because the barrel was plugged, at his brother's apartment at 950 Grand Concourse. He also stated that he had hid in the armory on January 1st when the police came because he thought the director of the armory was going to have him arrested for trespassing. Blake continued with petitioner's version of the events of January 1st on direct examination as follows:

A He stated that Robert [Irizarry] was talking about a stabbing that went down, and Robert said, "We, we yoked him up in—. . . . We yoked him up and took an Italian and took his dollars." He said that that's when the police arrived and Robert told him to keep cool, and he said he hi[d] behind Al's bed.

Tr. 557. Subsequent to this interview of petitioner, Blake went to the Grand Concourse and discovered there was no building numbered 950.

## DISCUSSION

*Ground One*

Petitioner's claim that his guilt was not proven beyond a reasonable doubt merely asks this court to draw inferences from the record that would be more favorable to a finding of innocence. Such a procedure is not cognizable on federal habeas review.

■ The standard for measuring the sufficiency of the evidence in a federal habeas corpus proceeding is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). *See also Rapetti v. James*, 784 F.2d 85, 90 (2d Cir. 1986). The elements of a crime may be

---

**3.** Young explained that "yoke" means "grabbing somebody." Tr. 345. Young added later on that Irizarry said "the dude tried to be bad, so he [apparently meaning Irizarry] stabbed the mother fucker." Tr. 347.

**4.** Officer Richard Bambach testified that on February 20, 1984 he and Officer Michael Kelly spoke to a security officer at the armory in response to a call. Bambach was not permitted to relate the substance of what the security officer had said, *i.e.*, apparently, the reason the police had been called. He testified that the security officer had directed him to petitioner, whom he asked to accompany him to the precinct. On arrival, petitioner was placed in an interview room and Detective Blake was called.

**5.** Blake was not permitted to tell the jury what petitioner's godmother had stated to him.

inferred from circumstantial evidence. *See, e.g., McShall v. Henderson,* 526 F.Supp. 158, 161 (S.D.N.Y.1981); *People v. Benzinger,* 36 N.Y.2d 29, 34, 364 N.Y.S.2d 855, 858, 324 N.E.2d 334, 336 (1974). Thus, "[a]s long as any competent evidence went to the fact-finders from which they could infer guilt beyond a reasonable doubt, the conviction will stand." *McShall v. Henderson,* 526 F.Supp. at 161. *See also United States v. Adegbite,* 877 F.2d 174, 180 (2d Cir.1989); *Neumann v. People of New York,* 526 F.Supp. 286, 291 (S.D.N.Y. 1981) ("Petitioner is not entitled to a writ of habeas corpus merely because his conviction is based upon possibly conflicting interpretations of the evidence and testimony.") Furthermore, this court cannot substitute its own evaluation of the evidence for the jury's, even in a case where it might be inclined to differ. *See Jackson v. Virginia,* 443 U.S. at 319–20, 99 S.Ct. at 2789–90; *Mallette v. Scully,* 752 F.2d 26, 31 (2d Cir.1984); *Gruttola v. Hammock,* 639 F.2d 922, 928 (2d Cir.1981).

■ Petitioner emphasizes that in his statements following the stabbing and prior to his death, Ferrara never indicated that there was more than one assailant, whom he described as a short, Hispanic male. Petitioner states that he is a black male standing 5'11". His understanding of the record is not completely accurate inasmuch as witness Carbone testified that when he visited Ferrara in the hospital, Ferrara stated that he was assaulted by "three guys." In any event, the fact that the victim may have given a description of the individual who confronted and stabbed him does not *ipso facto* mean that there were not more involved.

■ Petitioner next asserts that no witness observed him with any of the jewelry allegedly taken from the victim and, further, that no inference may be drawn from his possession of a large roll of bills, especially because the exact amount of money allegedly taken from the victim was not stated. This approach of viewing circumstances in isolation flies in the face of the confluence of circumstances and the jury's option and responsibility to consider all of the evidence in conjunction. The evidence was that petitioner, an individual subsisting at a men's shelter, shows up at the shelter suddenly in possession of a large roll of money, asking about selling jewelry and boasting that he "took off" an Italian man in his car at a nearby location only a short time after an Italian man is found stabbed in his car outside the shelter with the jewelry he was wearing and the large roll of money he was carrying missing. Additionally, the jury could have easily concluded petitioner, who initially hid from the police, when confronted by them told two lies concerning his whereabouts at the time of the crime.

Petitioner further argues that his having shown Adams a gun "is the best proof that petitioner was not present at the time the crime was committed nor did he have any idea as to what did occur for, as the record below clearly demonstrates, the victim was stabbed and there was no inference nor testimony from the victim prior to his death that a gun was involved in the robbery perpetrated against him." Memorandum of Law in Support of Petition for Habeas Corpus at 7. Adams' testimony and the stabbing, however, do not lead inexorably to the conclusion of petitioner's innocence. The jury was not obligated to draw the inference petitioner raises.

Viewed in its totality, the evidence was adequate to allow the jury to conclude that petitioner was involved in the stabbing and robbery of Ferrara.

*Ground Two*

Petitioner next contends that the prosecutor's comments during summation denied him a fair trial because the prosecutor's rhetorical flourishes misled the jurors as to their function in evaluating the evidence and suggested that defense counsel was attempting to trick them.

At the beginning of the prosecutor's summation, the court overruled a naked objection to the following remarks of the Assistant District Attorney:

> Of course, in summation, it is always good to mention certain inconsistencies, to make you think that there's reason-

able doubt. You plant a little seed hoping it to mushroom.

Tr. 728. Petitioner contends that these remarks and the one that immediately followed the court's ruling ("And to cloud up your minds. I'm not going to ask you [to] cloud up your minds") constituted an argument that the defense was trying to trick the jurors. Petitioner adds that the prosecutor capitalized on the impropriety by also saying:

> What is there in the record to show that these cops did something wrong? Just little seeds that are planted along the line. Seeds like bait, you throw them—
>
> MR. RASKIN: Objection.
>
> MR. ROSENBLATT: —like bait, when you are fishing, and you throw a little thing on the hook hoping that the little fishes will snap at it.
>
> MR. ROSENBLATT: Your Honor, I must object again, the bait, fishes example.
>
> THE COURT: Overruled. The jury will be properly instructed.

Tr. 741.[6] Following the prosecutor's summation, petitioner's counsel moved for a mistrial out of the jury's presence:

> MR. RASKIN: Your Honor, I anal[o]gize the comments by Mr. Rosenblatt regarding a seed to what our Courts have condemned as red herring arguments, search for reasonable doubt. The intent Mr. Rosenblatt had, I don't question nor do I care. I think what he is doing is demeaning the defendant's position and trying to place a burden on the defendant by suggesting that the defendant is trying to catch them or trick them by dangling bait in front of them. I think this is serious error. If he wants to comment on my comments, fine. If he wants to summarize the evidence [an indiscernible portion of defense counsel's argument was omitted at this point from the transcript] to suggest to a jury that I am trying to plant a seed and dangle bait such as one does when one fishes so the fish goes with the bait, I think it is [e]gregious error, and I think it is grounds for a mistrial. If he had said "red herring" or "cloud" in front of the j[u]ry, I am sure you would have sustained an objection, however, you didn't sustain any objection here, and I think your Honor is in error.
>
> THE COURT: Application is denied. I think it was more of a form of argument than anything else, and it is simply his characterization of the testimony that is presented to the jury which he has a right to do.

Tr. 742–43.

■ In response to this ground of the petition respondent contends that petitioner has failed to exhaust his state remedies because he failed to alert the Appellate Division to the federal constitutional nature of his claim.

The federal habeas corpus statute, 28 U.S.C. § 2254, requires a person in state custody to exhaust his state remedies before seeking federal habeas corpus review. This rule is based on considerations of comity between the federal and state courts, ensuring that the state courts have an opportunity to consider and correct any violations of their prisoners' federal constitu-

---

**6.** Moments later, the trial judge kept his word and instructed the jury as follows:

> Specifically, it is necessary that you decide each and every question of fact that has arisen in this trial and decide whether the People have proved the defendant's guilt beyond a reasonable doubt. This is to be determined solely on the evidence and the law which I will give you.
>
> The evidence consists of all the testimony that was presented at the trial plus whatever facts you may, as jurors, deduce from the exhibits. You are the sole judges of the facts, and it is your fundamental duty to determine the facts.

> It is your recollection of the testimony that you will rely upon in doing so. The recollection of the attorney is not binding upon you nor is my recollection of the facts binding upon you. The arguments, remarks, and summations of counsel are not evidence. If you find that the summations of counsel were based on the evidence, and you find the arguments logical, you may, if you cho[o]se, give conside[r]ation to such arguments or you may reject them entirely or in part.

Tr. 745–46.

tional rights. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Daye v. Attorney General of the State of New York*, 696 F.2d 186, 191 (2d Cir.1982) (en banc), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). Thus, exhaustion requires a petitioner to have presented to the state courts the same federal constitutional claims, legally and factually, he raises in his petition to the federal court so that the state courts will have had the initial opportunity to pass on them. *Picard v. Connor*, 404 U.S. at 275–76, 92 S.Ct. at 512–13; *Daye v. Attorney General, etc.*, 696 F.2d at 191. *See also McGann v. State of New York*, 870 F.2d 908, 910 (2d Cir.1989); *Morgan v. Jackson*, 869 F.2d 682, 684 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 284, 107 L.Ed.2d 264 (1989).

> Because non-constitutional claims are not cognizable in federal habeas corpus proceedings, *Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982), a habeas petition[er] must put state courts on notice that they are to decide federal constitutional claims. *See, e.g., Daye*, 696 F.2d at 192. It is not necessary for a habeas petitioner to cite "book and verse" of the Constitution, *id.* (quoting *Picard v. Connor*, 404 U.S. 270, 278, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)), but adequate notice to the state courts that they are to decide federal constitutional claims at least includes:
>
> > (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.
>
> *Id.* at 194.

*Petrucelli v. Coombe*, 735 F.2d 684, 687–88 (2d Cir.1984). *See also Grady v. LeFevre*, 846 F.2d 862, 864 (2d Cir.1988); *Holland v. Scully*, 797 F.2d 57, 64–65 (2d Cir.), *cert. denied*, 479 U.S. 870, 107 S.Ct. 237, 93 L.Ed.2d 162 (1986).

Relying on this rule, respondent premises the claim of nonexhaustion on petitioner's having cited the Appellate Division only to two New York state cases on this issue, *People v. Hicks*, 102 A.D.2d 173, 478 N.Y.S.2d 256 (1st Dep't 1984) and *People v. Brown*, 111 A.D.2d 248, 489 N.Y.S.2d 92 (2d Dep't 1985), neither of which employed constitutional analysis in treating claims of prosecutorial misconduct during summation. Respondent seemingly overlooks, however, that the point heading of petitioner's brief claimed the summation "DENIED APPELLANT HIS DUE PROCESS RIGHT TO A FAIR TRIAL. U.S. CONST., AMEND. *XIV* " (Brief for Defendant–Appellant at 26) and, on two of only three pages of the brief that were devoted to this point, petitioner argued he was denied his "due process right to a fair trial" (*Id.* at 27, 29). To say that the state courts cannot recognize a constitutional argument when the Constitution is cited to them would, indeed, be an insult to those courts. (Moreover, if, as respondent also claims, no error was committed, rejection of petitioner's claim on the merits cannot offend the principle of comity which underlies the exhaustion requirement.)

In the context of federal habeas review, the issue is

> . . . whether the prosecutor['s] comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

*Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *accord United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.), *cert. denied, sub nom. Shipp v. United States*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). *See also Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir.1986); *United States v. Pena*, 793 F.2d 486, 490 (2d Cir.1986).

During his summation petitioner's counsel had repeatedly characterized the case against his client as speculation, innuendo, guesswork and conjecture and told the jury that a guilty verdict in this case would be an extreme and egregious error

and an insult to justice. He stated that the police had not done their homework and asserted that if the forensic officer, who testified that he could not recover any latent fingerprints from Ferrara's car, had worked longer than the half-hour that he did, counsel would not be there giving a summation. He also criticized the officers at the scene for following guidelines which apparently did not require them to preserve the scene intact unless there had been a homicide. Additionally, he asserted that the evidence suggested Adams may have been a homosexual, that Adams testified the way he did to cover up his own involvement as Irizarry's accomplice and that his story about petitioner's having shown him the gun did not ring true and was far-fetched. He further stated that Young had not testified in a truthful manner and said, referring to Young, "I mean he made me a little uncomfortable when he testified because I didn't believe anything other than his name." Tr. 718. Under the circumstances, the subsequent remarks of the prosecutor about which petitioner complains were certainly within the range of rhetorical comment permissible during closing argument and did not deprive petitioner of a fair trial. *See, e.g., United States v. Resto,* 824 F.2d 210, 212 (2d Cir.1987); *United States v. Marrale,* 695 F.2d 658, 666–67 (2d Cir.1982), *cert. denied,* 460 U.S. 1041, 103 S.Ct. 1434, 1435, 75 L.Ed.2d 793 (1983); *Harper v. Kelly,* 704 F.Supp. 375, 379–80 (S.D.N.Y.1989); *Castro v. Sullivan,* 662 F.Supp. 745, 752 (S.D.N.Y.1987); *People v. Galloway,* 54 N.Y.2d 396, 399, 446 N.Y.S.2d 9, 11, 430 N.E.2d 885, 886 (1981). *See also People v. La Forge,* 107 A.D.2d 896, 483 N.Y.S.2d 842, 843 (3d Dep't 1985) (mem.).

### CONCLUSION

For all of the above reasons, I respectfully recommend that the petition be denied.

Copies of this Report and Recommendation have been mailed this date to the following:

Mr. Michael Martin
85–A–2363
P.O. Box 2000

Pine City, New York 14871
Stanley R. Kaplan, Esq.
Assistant District Attorney
215 East 161st Street
Bronx, New York 10451

The parties are hereby directed that if you have any objections to this Report and Recommendation you must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court and send copies to the Honorable Robert P. Patterson, Jr., to the opposing party and to the undersigned. Failure to file objections within ten (10) days will preclude later appellate review of any order that will be entered by Judge Patterson. *See* 28 U.S.C. § 636(b)(1); Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure; *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983) (per curiam).

Dated: New York, New York

September 12, 1990