**Thomas EDWARDS, Petitioner,**

v.

**Brian FISCHER, Superintendent of Sing Sing Correctional Facility, Respondent.**

**No. 01 Civ. 9397(RJH)(THK).**

United States District Court, S.D. New York.

Feb. 7, 2006.

Thomas Edwards, Ossining, NY, pro se.

Hilary Hassler, Robert M. Morgenthau, District Attorney, New York, NY, for Respondent.

### MEMORANDUM OPINION AND ORDER

HOLWELL, District Judge.

Petitioner Thomas Edwards brings this habeas petition pursuant to 28 U.S.C. § 2254 challenging his state court conviction for one count of murder in the second degree (felony murder) and one count of robbery in the first degree, crimes for which he is serving concurrent sentences of twenty-one years to life and from twelve to twenty-four years, respectively. In the petition, petitioner argues (1) that his Sixth Amendment right to confront witnesses was violated when the trial court refused to allow cross examination or expert testimony on the subject of the New York City Police Department's ("NYPD") guidelines on the use of deadly physical force; and (2) that the trial court violated petitioner's Fourteenth Amendment rights by giving erroneous instructions on the felony murder charge, and by holding a conference without petitioner and thereafter giving an erroneous *Allen* charge to the jury.

On July 12, 2004 Magistrate Judge Theodore H. Katz issued a Report and Recommendation (the "Report") recommending that the petition be denied in its entirety. After a brief extension, petitioner filed timely objections to the Report.

For the reasons set forth below, the Court adopts the Report in its entirety and denies the petition.

## BACKGROUND

The facts underlying petitioner's trial and incarceration are extensively outlined in the Report which is attached to this opinion for ease of reference. Petitioner and three accomplices attempted to rob a Chemical Bank branch located at 91st Street and Broadway in Manhattan. As they were fleeing the building one of Edward's accomplices, Sidney Fisher, exchanged shots with two police officers responding to a report of the robbery. Fisher ran west exchanging shots with and hitting a third police officer who had joined the chase. On 93rd Street, Fisher grabbed a bystander to use as a shield and continued to fire at the approaching officers. Fisher was hit and released the bystander but fell into a crouch and pointed his gun at the officers. Several officers fired at Fisher, killing him. However, the bystander was also hit, apparently by an officer's errant shot, and died as a result of her wound. At the same time Edwards and another accomplice fled eastward and were arrested, hiding in a building on 91st Street. Petitioner was thereafter charged with felony murder and robbery.

At a November 18, 1993 pretrial hearing petitioner's trial counsel sought permission to call an expert to testify regarding NYPD guidelines (the "Guidelines") on the use of deadly physical force. (*See* November 18, 1993 Preliminary Hearing Transcript 4 ("First Prelim. Hrg. Tr.").) At a second hearing conducted on December 3, 1993, the trial court preliminarily ruled that it was "not inclined to allow expert testimony on the issue of whether the police conduct was an intervening cause of the bystander's death." (December 3, 1993 Preliminary Hearing Transcript 2 ("Second Prelim. Hrg. Tr.").) The court offered, however, that "once counsel gets the transcript of the grand jury minutes and/or other discovery, if you choose to have your expert review that matter and summarize what he or she wants to say, you can do that and make your record whether you think it will add or detract from the jury consideration on the issue." (*Id.* at 2–3.) Petitioner did not subsequently proffer proposed expert testimony on the subject of the Guidelines.

But the subject did come up at trial. The transcript shows that during the cross-examination of Officer Bauman, counsel for petitioner's co-defendant asked: "[n]ow, when you were in the Police Academy receiving your training, you were instructed in certain situations when you would be authorized to use deadly force against another person, correct?" (Trial Tr. 2489.) The State objected to this question but was overruled after Officer Bauman answered affirmatively. Counsel then asked Officer Bauman a follow up question: "[d]eadly physical force would encompass shooting at them, correct?" (*Id.*) Before the officer could answer, the state renewed its objection and a sidebar was called.

At the sidebar, the State argued that defense counsel's line of questioning was inconsistent with the court's December 3 ruling in that it would impermissibly place before the jury the question of whether the officers' actions had violated the Guidelines. (*Id.* at 2490–91.) Counsel for petitioner's co-defendant responded that he only intended to ask the following three questions about Officer Bauman's police training: "(1) [were you] trained in the use of deadly force; (2) [can you use it] if somebody is shooting at you; [and] (3) [isn't it true that] you are not obligated to use it and you are trained not to use it if it would endanger innocent lives." (*Id.* at 2495.) The court then gave petitioner's counsel an opportunity to be heard on the

subject. Counsel responded: "I am joining in his application, Judge." (*Id.* at 2496.)

The court then ruled that Officer Bauman could be asked those three questions, provided they were prefaced with the phrase "[a]s a trained and experienced officer, you would agree...." (*Id.* at 2499–500.) At the same time, the court advised counsel that it would not allow inquiry into Officer Bauman's "particular training or deadly force or what his understanding is [regarding] what is in any manuals," explaining that it felt such issues irrelevant. (*Id.* at 2501.) The court concluded by asking for "[a]ny exceptions or further points." (*Id.* at 2502.) Petitioner did not note any exceptions, either in response to this invitation or during the remainder of Officer Bauman's testimony. (*See id.* at 2502–28B.)

After the jury convicted petitioner of robbery and felony murder, petitioner appealed on Sixth and Fourteenth Amendment grounds. With respect to petitioner's Sixth Amendment claim, the New York Appellate Division, First Department, held that "[s]ince [petitioner] acquiesced in the [trial] court's compromise ruling and did nothing to alert the court that it had still not provided appropriate relief, [petitioner] failed to preserve [his] claim that the court improperly precluded cross-examination of police officer concerning the internal police guidelines on the use of deadly force." *People v. Edwards,* 278 A.D.2d 151, 152, 717 N.Y.S.2d 596 (1st Dept.2000). The First Department also noted that, had it reviewed the claim, it would have concluded that "there was no need for a trial within a trial on the subject of police conduct" and that the trial court had nevertheless "allowed the defense

wide latitude in which to delve into [the] subject [of deadly physical force]." *Id.*[1]

Petitioner also claimed on appeal that the trial court violated his due process rights by failing to instruct the jury to consider whether Fisher's flight had terminated by the time the bystander was killed and by failing to give proper supplemental instructions in response to the jury's questions on this issue. Finally, petitioner claimed that he was deprived of his right to be present during a material stage of trial because he was not present at a colloquy in the judge's robing room on an *Allen* charge, which charge petitioner claims was coercive. The First Department rejected these claims without discussion. *Id.*

The New York Court of Appeals denied petitioner leave to appeal. *People v. Edwards,* 96 N.Y.2d 758, 758, 725 N.Y.S.2d 284, 748 N.E.2d 1080 (N.Y.2001). This petition followed and, as noted, on July 12, 2004, Magistrate Judge Katz issued a report recommending that it be denied. The Court now turns to petitioner's objections to the Report, beginning with the applicable standard of review.

## STANDARD OF REVIEW

A district court may designate a magistrate to hear and determine certain motions and to submit to the court proposed findings of fact and a recommendation as to the disposition of the motion. *See* 28 U.S.C. § 636(b)(1). Within ten (10) days of service of the recommendation, any party may file written objections to the magistrate's report. *Id.* If no objections are filed, or where objections are "merely perfunctory responses," argued in an attempt to "engage the district court in a rehashing of the same arguments set forth in the original petition," reviewing courts

---

**1.** Petitioner did not raise on appeal the additional Sixth Amendment claim raised in the instant objections, that is, whether the trial court erroneously excluded expert testimony on the Guidelines.

should review a report and recommendation for clear error. *Vega v. Artuz*, 2002 WL 31174466, at *1 (S.D.N.Y. Sept.30, 2002); accord *Nelson v. Smith*, 618 F.Supp. 1186, 1189 (S.D.N.Y.1985). On the other hand, where objections to a report are "specific and ... address only those portions of the proposed findings to which the party objects," district courts should conduct a *de novo* review of the issues raised by the objections. *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan*, 806 F.Supp. 380, 381–82 (W.D.N.Y.1992).

Petitioner does not expressly object to the Report's recommendation that his Fourteenth Amendment claims be denied.[2] This Court finds no clear error in that recommendation and therefore adopts it in its entirety.[3] The remainder of the Report—to which petitioner has objected with specificity—deals with petitioner's Sixth Amendment claim that he was denied the opportunity to cross examine state witnesses on the subject of the Guidelines. A *de novo* review of those sections of the Report follows.

## DISCUSSION

Edwards filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104–132, 110 Stat. 1214 (April 24, 1996). Thus, this Court applies the standard of review established by Section 2254(d) of AEDPA. *Torres v. Berbary*, 340 F.3d 63, 67–68 (2d Cir.2003); *Vasquez v. Strack*, 228 F.3d 143, 147 (2d Cir.2000). Under AEDPA, a federal court may grant a petition for habeas corpus, notwithstanding contrary state court adjudication on the merits, in accordance with the following provisions:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The primary issue raised by Edwards is whether the Appellate Division's determination that N.Y.Crim. Proc. Law § 470.05

---

**2.** In a footnote to his objections, petitioner explains that "[w]hile only [his] objections to the Magistrate's recommendation regarding the exclusion of evidence concerning the [G]uidelines is elaborated herein, it is no [sic] way intended as a waiver of any appropriate objection to the other parts of the [Report]." (Obj.3). This general objection cannot trigger *de novo* review. *Hunter v. Sabourne*, 2005 WL 2709176, at *4 (S.D.N.Y. Oct.20, 2005).

**3.** With respect to petitioner's first claim regarding the right to be present during the colloquy, Magistrate Judge Katz found that petitioner's absence from Judge Andrias' robing room did not "frustrate the fairness of the proceedings." (Report 20); *See Tennessee v. Lane*, 541 U.S. 509, 523, 124 S.Ct. 1978, 158

L.Ed.2d 820 (2004) (citation omitted). He also concluded that petitioner failed to show his presence at the robing room conference would have helped his defense. (Report 20.) With respect to the second due process claim regarding improper jury instructions, the Magistrate Judge properly found that petitioner failed to demonstrate how the *Allen* charge was incorrect under state law, much less that it "so infected the entire trial that the resulting conviction violates due process." (Report 13); *DelValle v. Armstrong*, 306 F.3d 1197, 1201 (2d Cir.2002). In addition, the Magistrate Judge correctly concluded that the trial court's supplemental instructions were "fair and balanced" responses to the jury's questions. (Report 17.)

(McKinney 1994) operated as a procedural bar to reviewing his Sixth Amendment claims was contrary to federal law. (*See* Pl.'s Objections 3–6.) Specifically, Edwards claims that the state appellate court improperly concluded that he had waived or otherwise procedurally defaulted on preserving his claims that the state trial court improperly (1) prohibited any reference to the Guidelines during cross-examination of Officer Bauman, and (2) precluded expert testimony on the Guidelines.[4] (*See* Pl.'s *Id.* at 3–4.) Edwards asserts that the decision of the Appellate Division amounted to an "exorbitant application" of the rule of preservation. (*Id.* at 3–6.)

## I. *Independent and Adequate State Law Grounds*

■ When a petitioner violates a state procedural rule which is " 'independent' of [a] federal question and 'adequate' to support the judgment," federal habeas review is generally foreclosed. *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Garcia v. Lewis,* 188 F.3d 71, 76 (2d Cir.1999); *Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996). The independent and adequate state ground doctrine "first arose in the context of direct appeals to the Supreme Court from final judgments of the state courts." *Garcia,* 188 F.3d at 76. Because the Supreme Court "has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory." *Coleman,* 501 U.S. at 729, 111 S.Ct. 2546. In order to avoid issuing advisory opinions that ran afoul of jurisdictional concerns, the Supreme Court thus announced that it would not review such adequate and independent state procedural grounds. *Id.*

The Supreme Court has extended the independent and adequate state ground doctrine to federal habeas review although jurisdictional concerns do not persist in that context. *Garcia,* 188 F.3d at 76. Specifically, a "habeas court's decision in a federal question would not be rendered advisory by the existence of an independent state ground of the decision" since the habeas court "does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter.*" *Id.* (internal citations omitted). As such, principles of finality, comity and the orderly administration of justice instead dictate that a federal habeas court faced with an independent and adequate state ground should defer to the state court's determination. *Dretke v. Haley,* 541 U.S. 386, 386, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004). In effect, the independent and adequate state doctrine prevents state prisoners whose custody was supported by independent and adequate state grounds from "undermin[ing] the state's interest in enforcing its laws." *Coleman,* 501 U.S. at 731, 111 S.Ct. 2546.

■ State procedural bars are independent and adequate when such laws are "firmly established and regularly followed" by the state in question. *Ford v. Georgia,* 498 U.S. 411, 422–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); *Cotto v. Herbert,* 331 F.3d 217, 239 (2d Cir.2003); *see also James v. Kentucky,* 466 U.S. 341, 348–49, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984) (holding that Kentucky's "distinction between [jury] admonitions and instructions [was] not the sort of firmly established and regularly followed state practice that can prevent implementation of federal constitutional rights"). According to New

---

4. The claim regarding exclusion of expert testimony was raised for the first time in petitioner's objections to the Report. It was not raised in the petition and, as noted, was not presented on appeal to the Appellate Division.

York's contemporaneous objection rule, the law at issue in this case, the basic preservation rules require "that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the [court] the opportunity to remedy the problem and thereby avert reversible error." *People v. Luperon,* 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 647 N.E.2d 1243 (1995); *accord Dugger v. Adams,* 489 U.S. 401, 408, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) (noting the benefits of state laws requiring timely objections); *see* N.Y.Crim. Proc. Law § 470.05. This rule is "firmly established and regularly followed" in New York. *E.g., Garcia,* 188 F.3d at 78–79 (following contemporaneous objection rule); *Bossett v. Walker,* 41 F.3d 825, 829 n. 2 (2d Cir.1994) (same); *Fernandez v. Leonardo,* 931 F.2d 214, 216 (2d Cir.1991) (same).

## II. *Appellate Division's Application of N.Y.Crim. Proc. Law § 470.05*

### A. *Limitations on Cross–Examination*

■ Petitioner asserts that, in the present case, the Appellate Division's finding of a violation of N.Y.Crim. Proc. Law § 470.05 amounted to an "exorbitant application" of the rule on preservation. (Pl.'s Objections 3–6.) Ordinarily, violation of firmly established and regularly followed state rules—for example, those involved in this case—will be adequate to foreclose review of a federal claim. *James,* 466 U.S. at 348, 104 S.Ct. 1830; *see Ford,* 498 U.S. at 422–24, 111 S.Ct. 850. There are, however, some "exceptional cases in which [the] exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna,* 534 U.S. 362, 366, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002). The Supreme Court has established three "guideposts" to determine if a state court has exorbitantly applied a procedural rule:

(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto,* 331 F.3d at 240 (citing *Lee,* 534 U.S. at 381–83, 122 S.Ct. 877). Such "guideposts" are not intended as a rigid test; they are factors to help "evaluat[e] the state interest in a procedural rule against the circumstances of a particular case." *Id.* at 240.

The Supreme Court has held that there exists only a "limited category" of such exceptional cases, where an exorbitant application renders an otherwise "adequate and independent" state ground inadequate. *Lee,* 534 U.S. at 376, 122 S.Ct. 877. For example, in *Lee,* a Missouri trial court judge denied the petitioner's motion for continuance because (1) the judge needed to be with his daughter in the hospital the next day, and (2) another scheduled trial prevented him from continuing petitioner's case on the following business day. *Id.* at 381, 122 S.Ct. 877. Upon direct appeal, a Missouri appellate court found the petitioner's continuance motion "defective" for failing to comply with a Missouri state rule requiring continuance motions to be both in writing and accompanied by an affidavit. *Id.* at 366, 122 S.Ct. 877. However, upon further appeal, the Supreme Court held that the appellate court's application of the Missouri rule had been exorbitantly applied in the petitioner's case, because the trial judge had denied the petitioner's motion for "a reason that *could not have been*

countered by a perfect motion for a continuance." *Id.*

The Second Circuit has stated that the first *Lee* factor—whether the trial court "actually relied" on the procedural violation—is not dispositive in evaluating the need for contemporaneous objection. *See Cotto*, 331 F.3d at 242 (explaining that "the lack of contemporaneous objection would not, almost by definition, be mentioned by the trial court").

Regarding the second *Lee* factor, New York cases compel a party to comply with the contemporaneous objection rule in order to preserve an objection for appellate review. *People v. Quinones*, 250 A.D.2d 352, 672 N.Y.S.2d 689 (N.Y.App.Div.1998); *Luperon*, 85 N.Y.2d at 78, 623 N.Y.S.2d 735, 647 N.E.2d 1243. According to this rule, questions of law are preserved for review only when a "protest ... was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y.Crim. Proc. Law L. § 470.05. The New York Court of Appeals has stated that such a rule "requires, at the very least, that any matters which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." *Garcia*, 188 F.3d at 78 (quoting *Luperon*, 85 N.Y.2d at 78, 623 N.Y.S.2d 735, 647 N.E.2d 1243); *see Fernandez*, 931 F.2d at 216 (holding that failure to object at trial renders a claim procedurally defaulted under N.Y.Crim. Proc. Law § 470.05).

Generally, "once a party has made his position known to the court, the law does not require [him] to make repeated 'pointless protests' after the court has ruled." *Cotto*, 331 F.3d at 247. The Second Circuit has held, however, that "the question is whether the application of the procedural rule is 'firmly established and regularly followed' *in the specific circumstances presented in the case.*" *Id.* at 240 (emphasis added). In the specific context of a compromise ruling, New York cases indicate that an additional objection is required in order to preserve the inadequacy of the ultimate compromise ruling. *See, e.g., People v. Cintron*, 304 A.2d 454, 455, 758 N.Y.S.2d 636 (1st Dept.2003) (where "[d]efendant clearly acquiesced in the court's compromise ruling ... [t]he defendant failed to preserve his present challenge to that ruling"); *People v. Jones*, 256 A.D.2d 30, 31, 680 N.Y.S.2d 847 (N.Y.App. Div.1998) (same); *Quinones*, 250 A.D.2d at 352, 672 N.Y.S.2d 689 (defendant's challenge unpreserved because of failure to object to the court's compromise ruling); *People v. McAllister*, 245 A.D.2d 184, 184, 665 N.Y.S.2d 897 (N.Y.App.Div.1997) (same).

Petitioner's agreement to the compromise ruling without further objection, therefore, does not constitute "substantial compliance" with N.Y.Crim. Proc. Law C.P.L. § 470.05 as prescribed by the third *Lee* factor. Petitioner expressly agreed to a compromise ruling permitting counsel for co-petitioner to ask only three particular questions regarding officer Bauman's training in the use of deadly physical force. (Trial Tr. 2496.) The court prohibited counsel from asking any additional questions about the police guidelines. (*Id.* at 2500.) Petitioner raised no objections to the compromise ruling at this, or any other time during the trial. (*See id.* at 2502.)

Subsequent objections to the compromise ruling would have alerted the court of "any potential error while there [was] still an opportunity to address it," *Cotto*, 331 F.3d at 245. This, according to N.Y.Crim. Proc. Law § 470.05, is the very governmental interest underlying the contemporaneous objection rule. *Id.* at 243; *cf.*

*Lee,* 534 U.S. at 366, 122 S.Ct. 877 (holding that a requirement that continuance applications be written rather than oral, in the midst of a trial, are only ritual and do not further a "perceivably state interest"). Furthermore, the "realities of trial" permit such objections to be made. *Cf. Lee,* 534 U.S. at 383, 122 S.Ct. 877 (noting that the "realities of trial" do not require counsel to complete a written continuance application, along with an affidavit, in the midst of trial).

Accordingly, the Appellate Division's determination that petitioner "fail[ed] to alert the court that it had still not provided appropriate relief" is consistent with New York's contemporaneous objection law which requires an objecting party to lodge a protest at a time when the court has an "opportunity of effectively changing the same." *See* N.Y.Crim. Proc. Law § 470.05. Such a holding is also reasonable in light of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (AEDPA). *See Lee,* 534 U.S. at 378, 122 S.Ct. 877 ("the general principle [is] that an objection which is ample and timely to bring the alleged federal error to the attention of the trial court and enable it to take appropriate corrective action is sufficient to ... preserve the claim for review").

## B. *Preclusion of Expert Testimony*

■ With regard to petitioner's claim concerning the preclusion of expert testimony, petitioner failed to assert this claim in his direct appeal to the Appellate Division. Since the Appellate Division was never given the opportunity to review this claim, petitioner has failed to exhaust the claim in the state courts. *See Galdamez v. Keane,* 394 F.3d 68, 72 (2d Cir.2005) (stating that "[c]omity thus dictates that ... state courts should have the first opportunity to review [the] claim and provide any necessary relief"); *accord Feaster v. Besh-*

*ears,* 56 F.Supp.2d 600, 604 (D.Md.1999) ("The doctrine of exhaustion is grounded in principles of comity, and provides states with the first opportunity to address and correct alleged violations of state prisoner's rights.") The Court notes that "[g]enerally, if a federal habeas petition contains unexhausted claims, a federal court should dismiss it." *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994). However, the Second Circuit has held that such claims may be deemed exhausted if a petitioner has no further "remedies available" in the state courts. *Id.* (citing *Grey v. Hoke,* 933 F.2d 117, 120–21 (2d Cir.1991)).

For example, in *Bossett v. Walker,* the petitioner failed to include two of his claims when he applied for leave to appeal to the New York Court of Appeals. *See id.* at 829. The Second Circuit held that the petitioner's failure to address these claims before the Court of Appeals barred further review in the New York courts since he "ha[d] already made the one request for leave to appeal to which he is entitled." *Id.* (citing N.Y. Court Rules § 500.9(a)). The Second Circuit also precluded the appellants from seeking collateral review. *Id.* (citing N.Y.Crim. Proc. Law § 440.10(2)(c) (McKinney 1994)) (stating that where the claim could have been raised on direct review but was not, collateral review is barred). Noting that it would be "fruitless" to require the appellants to then bring the claims in state court, the Second Circuit found the claims exhausted. *Id.* Similarly, in the present case, petitioner failed to include his claim regarding preclusion of expert testimony when he applied for leave of appeal, and therefore had no more "remedies available" for pursuing this claim in New York courts. Therefore, the Court deems petitioner's claim exhausted.

■ The Court notes, however, that petitioner raises his claim regarding the pre-

clusion of expert testimony for the first time in his objections to the Report. In the context of federal habeas review, "a petitioner is not permitted to raise an objection to a magistrate judge's report that was not raised in his original petition." *Chisolm v. Headley,* 58 F.Supp.2d 281, 284 n. 2 (S.D.N.Y.1999) (citing *Harris v. Pulley,* 885 F.2d 1354, 1377–78 (9th Cir.1988)). Otherwise, "it would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments." *Abu–Nassar v. Elders Futures, Inc.,* 1994 WL 445638 at \*5, n. 2, (S.D.N.Y. Aug.17, 1994).

 In any event, the Court dismisses this claim as meritless. When counsel for petitioner sought a ruling during a preliminary hearing allowing him to call an expert to testify about police guidelines on the use of force, the state trial court stated that it was "not inclined to allow expert testimony on the issue of whether the police conduct was an intervening cause." (Second Prelim. Hrg. Tr. 2.) However, the court then stated that "once counsel [got] the transcript of the grand jury minutes and/or other discovery," they could proffer a summary of expert testimony for the court to consider. (*Id.* at 2–3). Petitioner's counsel responded "fine, your Honor," but failed to submit any proposed expert testimony once he received the grand jury transcript or at any other point during the trial.

C. *Petitioner's Request for Review on the Merits, Asserting Actual Innocence*

Notwithstanding the state procedural bar, petitioner asks the court to exercise review over his Sixth Amendment claims because a subsequent civil verdict entered against Police Officer Bauman proves petitioner's innocence. (*See* Pl.'s Objections 6–8). Respondent argues that, despite any

procedural deficiencies, petitioner's claim is without merit. (Answer 42.)

 A federal habeas petitioner "may bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, i.e., that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir.2002) (citing *Schlup v. Delo,* 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)); *Murray v. Carrier,* 488 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Actual innocence, however, "means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). To demonstrate "actual innocence" a habeas petitioner must introduce new reliable evidence that was not present at trial. *Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir.2003). The petitioner "must [then] show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup,* 513 U.S. at 327, 115 S.Ct. 851; *Sweet v. Bennett,* 353 F.3d 135, 142 (2d Cir.2003) (rejecting actual innocence claim where petitioner merely asserted that jury charges against him were inconsistent).

Petitioner has not met that burden here. His claim, in essence, is that Officer Bauman's actions (a bullet from his gun apparently struck and killed the victim) were an intervening force sufficient to relieve him of guilt for felony murder. (Pl.'s Objections 6.) In making this argument, petitioner asserts that the jury in the civil case that found Officer Bauman liable had the "benefit" of expert testimony regarding such deadly police force, the implication being that his criminal jury would have reacted similarly had it been presented with similar evidence. (Pl.'s Objections 7–8.) Although not without superficial ap-

peal, this argument has several flaws. Most prominently, it overlooks the fact that "different burdens of proof complicate efforts to analogize between criminal and civil trials." *Ferreira v. Westchester County*, 917 F.Supp. 209, 218 (S.D.N.Y. 1996); *accord Anderson v. Liberty Lobby*, 477 U.S. 242, 272, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, a civil finding of police negligence or recklessness is simply not equivalent to—and therefore cannot be analogized with—a finding that police conduct was an intervening cause sufficient to exculpate a defendant a charge of felony murder charge.

Indeed, for just this reason, and "to ensure that the fundamental miscarriage of justice exception [remains] 'rare,'" *Schlup*, 513 U.S. at 321, 115 S.Ct. 851, actual innocence must be demonstrated by presenting new reliable evidence, i.e., "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Id.* at 324, 115 S.Ct. 851. Petitioner has presented no such evidence in this case and therefore has not "ma[d]e the necessary showing required under *Schlup* to bypass the procedural bars." *See Dunham*, 313 F.3d at 730. Neither has petitioner shown cause for his procedural default because he has failed to identify an "objective factor external to the defense impeded counsel's efforts to comply with [New York's] procedural rule." *Fernandez*, 931 F.2d at 216 (citing *Murray*, 477 U.S. at 488, 106 S.Ct. 2639). Accordingly, petitioner's final objection is also rejected.

## CONCLUSION

The petition is denied. Petitioner has not made a substantial showing of a denial of a federal right, *Tankleff v. Senkowski*, 135 F.3d 235, 241 (2d Cir.1998), and as such, the Court also declines to issue a certificate of appealability, *see* 28 U.S.C. § 2253(c)(2). The Clerk of the Court is directed to dismiss the petition and close this case.

SO ORDERED.

## REPORT AND RECOMMENDATION

KATZ, United States Magistrate Judge.

This habeas corpus preceding was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(d) of the Southern District of New York Local Civil Rules.

On February 2, 1995, following a jury trial, Petitioner Thomas Edwards was convicted of Murder in the Second Degree (N.Y. Penal Law § 125.25(3)), and Robbery in the First Degree (N.Y. Penal Law § 160.15(2)). Petitioner was sentenced as a second violent felony offender to concurrent, indeterminate prison terms of from twenty-one years to life for Murder in the Second Degree, and from twelve to twenty-four years for Robbery in the First Degree.

Petitioner seeks habeas relief under 28 U.S.C. § 2254 on the grounds that (1) he was denied his due process right to be present during a material stage of his trial; (2) he was denied his right to due process by the trial court's failure to deliver proper jury instructions; and (3) he was denied his Sixth Amendment right to confront witnesses against him. (*See* Traverse Brief for Petitioner ("Pet'r Br.") at 34–58.)

Respondent argues that (1) Petitioner's challenges to the court's jury instructions are not cognizable in this federal habeas proceeding, and in any event, are meritless; (2) Petitioner was not denied his right to be present at a material stage of trial, and the court's *Allen* charge was balanced and fair; and (3) Petitioner's claim that he was denied his right to confront witnesses against him is procedurally barred and meritless. (*See* Resp't's Mem.

of Law In Answer to Pet. ("Resp't Mem.") at 35–57.)

For the reasons that follow, Petitioner's claims are either procedurally barred or meritless. Accordingly, this Court respectfully recommends that the Petition be dismissed with prejudice.

## BACKGROUND

### I. *Evidence at Trial*

On January 29, 1993, Petitioner and three accomplices entered Chemical Bank, located at 91st Street and Broadway in Manhattan. (*See* Tr. at 303, 310–14, 349.) Two of the robbers, wearing yellow construction helmets, goggles, and dust masks, vaulted over the "bandit barrier" in front of the teller windows. (*See id.* at 253, 310–11, 346, 381–82, 407–08, 473–74, 614–15, 966, 1286–87.) The third robber, Sidney Fisher ("Fisher"), was positioned at the south end of the bank, wearing a dark mask, gloves and a hat. (*See id.* at 589.) Russell Gray ("Gray"), the fourth accomplice, entered the bank at the north door, brandishing a semi-automatic pistol, and announced, "[t]his is not a robbery [ ][i]t is a political statement." (*Id.* at 254; *see also id.* at 312–15, 319.) He was wearing a dark coat, a dark cap, and a white dust mask over his mouth. (*See id.* at 312–16, 459–60, 952–53.) Using a digital clock, red wires, and a green clay-like substance, Gray assembled what appeared to be a bomb and attached it to the north door. (*See id.* at 568–69.) A Bomb Squad Detective later determined that the device was a hoax. (*See id.* at 983–88.) Two bank employees activated the bank's silent alarm, while a third called the police on the telephone. (*See id.* at 254, 312, 348, 427.) Eventually, Gray began to yell to the others "it's time to go . . . [t]hey are here." (*Id.* at 322; *see also id.* at 374–75, 968.)

Officers Edward Brown ("Brown") and Michael Moss ("Moss"), responding to a report of the robbery, approached the bank on foot with their guns drawn at their sides. (*See id.* at 1910–13.) They spotted one of the suspects emerging from the bank, and when Moss asked him to "[c]ome here for a second," the suspect fled. (*Id.* at 2106–07; *see also id.* at 1916.) As Moss and Brown set out in pursuit, Fisher emerged from another door. (*See id.* at 1916–18.) Fisher paused for a moment, and then fired a shot at Brown, and Brown responded by firing three shots back at Fisher. (*See id.* at 1918.) All of the shots having missed their target, Fisher began to flee, and Brown and Moss pursued him. (*See id.* at 1919, 2108.) Hugh O'Rourke ("O'Rourke"), an off-duty police sergeant who witnessed the exchange of gunfire, drew his revolver and joined the chase. (*See id.* at 1698–1703, 1921.) Transit Police Officer Ronald Bauman ("Bauman") and Sergeant Anthony Savarese ("Savarese"), who heard the direction of the chase on their police radio, positioned their marked police car in Fisher's flight path, at the intersection of 93rd Street and West End Avenue. (*See id.* at 1924–25, 1706, 2110, 2376–78, 2429–32.) Fisher crossed the intersection diagonally, and fired several shots at Bauman, who fired back. (*See id.* at 2432–34.) One of Fisher's shots hit Bauman in the abdomen, but he was uninjured because he was wearing a bullet-proof vest. (*See id.* at 2435–36.)

As Fisher ran down 93rd Street, Bonnie Vargas ("Vargas") exited a residential building onto 93rd Street and collided with Fisher. (*See id.* at 2298–99, 2437–38, 2974.) Fisher grabbed her around the neck and pulled her body close to him in order to use her as a shield, ordering the police to "stay back." (*Id.* at 2172; *see also id.* at 1656, 2384, 2437–38, 2974–75.) Fisher aimed the gun at Vargas's head, and shot at the police officers approaching on 93rd Street. (*See id.* at 789, 791, 795,

1713, 1936–37, 2836, 2975.) Fisher continued moving west on 93rd Street towards Riverside Drive, dragging Vargas with him. (*See id.* at 791, 795, 2115, 2118.) The police were converging on Fisher from all directions. (*See id.* at 793, 1709, 1929–30.) As the officers formed a semi-circle around Fisher and Vargas, ranging ten to twenty feet away from them, various officers shouted "let the woman go" and "drop the gun." (*Id.* at 1712; *see also id.* at 1710, 2212, 2240, 2975.) Fisher responded by firing his weapon at clusters of officers. (*See id.* at 791, 795, 1713, 1937, 2116, 2213, 2440.) Eventually, Officer Kastner fired a shot at Fisher from behind a car. (*See id.* at 799–800.) As Fisher fired another shot at the police officers, Officer Kastner hit Fisher with a shot in the hip. (*See id.* at 799, 896.) Fisher flinched as he was hit, allowing Vargas to move away from him. (*See id.* at 799–800, 2440–41, 2454–55, 2888–90, 2897–99, 3020–23, 3032.) Fisher crouched to a three-point stance, with his gun pointed at the officers in the street. (*See id.* at 1714, 2840, 2888.) Seeing that the separation between Fisher and Vargas presented a clear shot, several of the officers fired at Fisher. (*See id.* at 799–804, 896, 2441, 2455, 2479, 2739–42, 2749, 2888, 2837–40, 2846, 2898.) Fisher collapsed to the pavement, and was later pronounced dead at the scene. (*See id.* at 1463, 2119, 2749.) Vargas was laying on the pavement with an apparent gunshot wound to the chest. (*See id.* at 802–03, 2316.) She had no pulse and was not breathing. (*See id.* at 522.) Paramedics on the scene intubated her, and transported her to St. Luke's Hospital where she later died. (*See id.* at 522–26, 549.) Ballistics evidence showed that the bullet which caused the fatal wound to Vargas was a .38 caliber bullet, consistent with the type of ammunition issued to the police. (*See id.* at 3204–06.)

Meanwhile, a witness saw a man wearing a white dust mask, army jacket, and a construction helmet, and carrying a brown bag, running east on 91st Street. (*See id.* at 1140–42.) Another witness saw another man, who was wearing a yellow construction helmet, running east on 92nd Street. (*See id.* at 1128–29.) Lea Elwin ("Elwin") heard a noise from the alleyway below her second floor apartment at 203 West 91st Street. (*See id.* at 620–23.) When she looked out of her window she saw Petitioner and Russell Gray pushing against a locked door at the building next to hers. (*See id.* at 624.) She called the emergency operator and reported that two men were attempting to break into the building. (*See id.* at 625.) While searching the alleyway behind Elwin's building, the police discovered Petitioner and Gray hiding in a cutout section of the building east of Elwin's. (*See id.* at 1048–49, 1226–29, 1384–85.) In a nearby courtyard, the police discovered a brown glove and a white painter's dust mask, both containing the same green clay-like substance Gray had used to assemble the hoax bomb at the bank. (*See id.* at 1001.) Further into the courtyard, underneath an abandoned stove, they discovered a second dust mask, three brown gloves, a black jacket, a dark blue police style shirt, a dark blue police tie, a light gray sweatshirt, two loaded .9 millimeter semi-automatic handguns, and a gym bag filled with money. (*See id.* at 1001–03, 1012–15.)

The jury found Petitioner guilty of Robbery in the First Degree (*see id.* at 3935) and Murder in the Second Degree. (*See id.* at 3948–49.)

## II. *Post Trial Proceedings*

Petitioner, through counsel, appealed his conviction to the Appellate Division, First Department, claiming that (1) his conviction was against the weight of the evidence; (2) his Sixth Amendment right to confront witnesses against him was violated when the trial court refused to allow

cross-examination of police officers concerning internal department guidelines on the use of deadly physical force; and (3) Petitioner should not have been convicted of felony murder because Fisher was not in immediate flight from the robbery when the victim was killed, and the reckless conduct of a police officer was a superceding event which caused the hostage's death. (*See* Defendant–Appellant's Brief ("Def.-Appellant's Br."), Appendix to Resp't Answer ("App. to Resp't Answer") Ex. A at 22–35.) Petitioner also filed a *pro se* supplemental brief claiming that (1) he was deprived of a fair trial by the court's failure to properly instruct the jury to consider whether Fisher's flight had terminated before Vargas was shot, and its failure to provide meaningful supplemental instructions in response to the jury's questions; (2) he was deprived of the right to be present during a material stage of trial; and (3) the police violated his Fourth Amendment rights by conducting a warrantless arrest without probable cause. (*See* Defendant–Appellant's Supplemental Brief ("Def.-Appellant's Supp. Br."), App. to Resp't Answer Ex. B at 18–48.)

The Appellate Division affirmed Petitioner's conviction, finding that the verdict was not against the weight of the evidence, and the allegedly reckless police conduct did not constitute a supervening cause. *See People v. Edwards*, 278 A.D.2d 151, 151–52, 717 N.Y.S.2d 596, 597–98 (1st Dep't 2000). The Appellate Division also held that Petitioner had failed to preserve his Sixth Amendment Confrontation Clause claim. *See id.*, 278 A.D.2d at 152, 717 N.Y.S.2d at 598.

In a letter dated February 26, 2001, Petitioner, through counsel, sought leave to appeal to the New York Court of Appeals. (*See* Letter to the Honorable George Bundy Smith, dated Feb. 26, 2001 ("Pet'r's Leave Letter"), App. to Resp't Answer Ex. F.) Leave was denied. *See*

*People v. Edwards*, 96 N.Y.2d 758, 725 N.Y.S.2d 284, 748 N.E.2d 1080 (2001). Petitioner subsequently submitted a supplemental *pro se* letter seeking leave to appeal the issues raised in his supplemental *pro se* appellate brief. (*See* Letter from Petitioner to the Hon. George Bundy Smith, dated June 6, 2001 ("Pet'r's *Pro Se* Leave Letter"), App. to Resp't Answer Ex. H.) The Court of Appeals treated Petitioner's letter "as a request for reconsideration of [Petitioner's] application for permission to appeal" (*see* Letter to Pet'r, dated June 28, 2001, App. to Resp't Answer Ex. H), which the court granted, but in the same order it denied Petitioner leave. (*See* Reconsideration Certificate Denying Leave, dated July 26, 2001, App. to Resp't Answer Ex. J.)

Subsequently, Petitioner filed the instant action.

## DISCUSSION

### I. *Standard of Review*

A state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *see also Leslie v. Artuz*, 230 F.3d 25, 32 (2d Cir.2000); *Clark v. Stinson*, 214 F.3d 315, 320 (2d Cir.2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state court decision. *See Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004); *Williams*, 529 U.S. at

412, 120 S.Ct. at 1523; *Leslie,* 230 F.3d at 32.

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. *See Yarborough,* 124 S.Ct. at 2149 (citing *Williams,* 529 U.S. at 413, 120 S.Ct. at 1523). The inquiry for a federal habeas court is not whether the state court's application of the governing law was merely erroneous or incorrect, but rather whether it was "objectively unreasonable." *See Williams* 529 U.S. at 408–10, 120 S.Ct. at 1521–22; *Lurie v. Wittner,* 228 F.3d 113, 128–29 (2d Cir.2000).

## II. *Petitioner's Claims*

### A. *Improper Jury Instructions*

Petitioner claims that the trial court committed constitutional error by failing to properly instruct the jury, in connection with the felony murder charge, to consider whether Fisher's flight had terminated by the time Vargas was killed, and that the court committed further error by failing to provide meaningful and proper supplemental instructions in response to the jury's questions. (*See* Traverse Br. for Pet'r ("Pet'r Br.") at 44.) Respondent contends that Petitioner's challenges to the jury instructions fail to raise a constitutional issue, and are therefore not cognizable on habeas review. In any event, Respondent contends that the court's charge was not erroneous. (*See* Resp't Mem. at 52.)

 "[T]he fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire,* 502 U.S. 62, 71–72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991)(citing *Marshall v. Lonberger,* 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983)). "The question in [ ] a collateral proceeding is 'whether the ailing instruction by itself so infected the entire

trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous', or even 'universally condemned.'" *DelValle v. Armstrong,* 306 F.3d 1197, 1201 (2d Cir.2002)(quoting *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977)); *see also Middleton v. McNeil,* 541 U.S. 433, 124 S.Ct. 1830, 1832, 158 L.Ed.2d 701 (2004)(per curiam); *Estelle,* 502 U.S. at 72, 112 S.Ct. at 482. "Moreover, [P]etitioner's burden is especially great when his claim is based on an omitted charge, rather than an erroneous one." *Bass v. Scully,* No. CV–92–0349, 1995 WL 347040, at *4 (E.D.N.Y. May 25, 1995)(citing *Henderson,* 431 U.S. at 155, 97 S.Ct. at 1737). It is well-established that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *McNeil,* 124 S.Ct. at 1832 (quoting *Boyde v. California,* 494 U.S. 370, 378, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990)).

#### 1. *Failure to Instruct Jury to Consider Whether Flight Had Terminated*

 Under New York law, "[w]hether [a] homicide occurred in 'immediate flight' from a felony is generally a question of fact for the jury." *People v. Slaughter,* 78 N.Y.2d 485, 490, 577 N.Y.S.2d 206, 210, 583 N.E.2d 919 (1991)(citing *People v. Gladman,* 41 N.Y.2d 123, 129, 390 N.Y.S.2d 912, 916, 359 N.E.2d 420 (1976)). In making this determination, the jury should be instructed to consider:

whether the homicide and the felony occurred at the same location or, if not, [ ] the distance separating the two locations. Weight may also be placed on whether there is an interval of time between the commission of the felony and the commission of the homicide. The jury may properly consider such additional factors as whether the cul-

prits had possession of the fruits of the criminal activity, whether the police … were in close pursuit, and whether the criminals had reached a place of temporary safety.

*Gladman,* 41 N.Y.2d at 129, 390 N.Y.S.2d at 916, 359 N.E.2d 420; *see also Slaughter,* 78 N.Y.2d at 490–91, 577 N.Y.S.2d at 210, 583 N.E.2d 919.

██ Petitioner claims that the court failed to instruct the jury to consider whether flight had terminated before the homicide occurred. However, the record indicates that after instructing the jury on the first two elements of New York's felony murder statute, the court (Andrias, J.) explained that the third element "requires the People to prove the victim's death was caused during the commission of the Robbery or in the immediate flight therefrom." (Tr. at 3783.) The court further explained to the jury that in determining whether the death occurred in "immediate flight therefrom," it may consider such factors as:

> [t]he time between the commission of the Robbery, and the firing of the fatal shot or shots.
>
> The distance between the location of the Robbery and the location of the fatal shot or shots.
>
> Whether the police were in close pursuit. Whether the Robbery participant, Sidney Fisher, had reached a place of temporary safety between the location of the Robbery and the location of the fatal shots.
>
> And any other evidence presented during the trial that you find relevant on the issue of immediate flight therefrom.

(*Id.* at 3784.)

This charge was entirely consistent with the instructions of the New York Court of Appeals, and Petitioner has failed to demonstrate how the charge was incorrect under state law, much less that it "so infected the entire trial that the resulting convic-

tion violates due process." *DelValle,* 306 F.3d at 1201 (internal quotation marks omitted). Accordingly, Petitioner's claim—that the trial court failed to properly instruct the jury to consider whether Fisher's flight had terminated—is not a basis for federal habeas relief and should be dismissed.

### 2. *The Court's Supplemental Instructions*

Petitioner also claims that the state court failed to provide meaningful and proper supplemental instructions in response to the jury's questions.

██ When responding to a jury question, "the court 'must give such requested information or instruction as the court deems proper.' Determination of the appropriate answer rests within the discretion of the trial court, so long as the answer given does not deprive a defendant of a constitutional right." *McShall v. Henderson,* 526 F.Supp. 158, 161 (S.D.N.Y.1981)(quoting N.Y.Crim. Proc. Law § 310.30); *see also Moore v. Scully,* 956 F.Supp. 1139, 1147 (S.D.N.Y.1997)(a court is afforded "a broad range of discretion" when responding to a jury request). Indeed, "[o]nce the judge has made an accurate and correct charge the extent of its amplification must rest largely in his discretion. The trial judge, in the light of the whole trial and with the jury before him, may feel that … to indulge in variations of statement might well confuse." *United States v. Sacco,* 436 F.2d 780, 783 (2d Cir.1971)(quoting *United States v. Bayer,* 331 U.S. 532, 536, 67 S.Ct. 1394, 1396, 91 L.Ed. 1654 (1947)); *see also Ortiz v. Artuz,* 113 F.Supp.2d 327, 339 (E.D.N.Y. 2000); *McShall,* 526 F.Supp. at 162.

██ After beginning its deliberations, the jury sent out notes requesting certain photographic exhibits, and that the court repeat the jury charge on the elements of

felony murder. (*See* Tr. at 3832.) In response, the court repeated the entire charge it had initially given with respect to felony murder, including the portion explaining "immediate flight." (*Id.* at 3833–44.) Subsequently, the jury sent out another note asking, "what would be necessary to break the causal chain ... what defines the elements of immediate flight, and ... is the chain of causation broken if the perps take different directions of flight and have no awareness of [each] others actions?" (*Id.* at 3865.)

The court notified the attorneys that, although it believed the proper answer to the third question was no, it intended to answer it by repeating the causation portion of the original jury charge. (*See id.* at 3847–48.) The court explained that responding to this question with an absolute "no," as the prosecutor requested, "would invite almost a directed verdict." (*Id.* at 3847.) Therefore, the court essentially repeated its original instruction on causation. (*See id.* at 3865–72.)

With regard to the elements of immediate flight, defense counsel requested that the court further define the term "flight" as "avoiding apprehension," or use some other descriptive word. (*Id.* at 3855–56.) However, the court was "satisfied with the charge" in its original form as "the best balanced way to leave it with the jury" (*id.* at 3857), and, accordingly, it repeated the original charge on immediate flight. (*See id.* at 3872–74.)

Several hours later, the jury again requested further instruction from the court on several issues. First, the jury asked whether "the taking of a hostage in the course of [ ] flight from a bank [can] be considered an unforeseen circumstance? ... [P]lease explain the use of the term 'unforeseen circumstance' [ ] in relation to the taking of a hostage." (*Id.* at 3892.) The court explained that

[t]he death of Ms. Vargas must be a reasonably foreseeable consequence of the conduct of either defendant or of another participant in the robbery.... If it is reasonably foreseeable that a person would be shot and killed during an armed robbery or in the immediate flight therefrom, then it is immaterial that the robbery participant did not intend Ms. Vargas's death or did not anticipate that it occurred in a particular fashion or planned the outcome.

(*Id.* at 3892–93.) After Petitioner's objection, and at his request, the court added,

[o]n the other hand, if you find that Ms. Vargas's death was too remote from [Sidney] Fisher's course of conduct or too unlikely, or not reasonably foreseeable or if you find that the connection between [Sidney] Fisher's conduct and Ms. Vargas's death is weak and attenuated, then there is no proximate causation and the robbery participants cannot be found to have caused the death.

(*Id.* at 3901–02.)

The jury also asked the court to repeat the portion of the charge pertaining to "acting in concert" and whether "the separation of the gunman [sic] on leaving the bank meant they are no longer acting in concert." (*Id.* at 3894.) The court explained that the acting in concert requirement "pertains to the robbery only. It is not necessary for these defendants and Mr. [Sidney] Fisher to act in concert with respect to the death of Ms. Vargas." (*Id.* at 3902.)

In its next note, the jury requested that the court "re-define flexibility as it pertains to the ... notion[ ] of a contributory cause." (*Id.* at 3895.) The court explained that "[t]he term flexibility is used in essence to tell you that you will make a factual determination in this case ...." regarding "[w]hether the acts of one of the participants may have been found to cause

the death of a non-participant. . . ." (*Id.* at 3895.)

Finally, the jury requested that the court "please clarify the responsibility of all the participants, that is, involvement in the murder trial as stipulated in the law, including the phrase, unforeseen remote circumstances." (*Id.* at 3920.) The court responded by explaining that the "precise language, unforeseen remote circumstances . . . does not appear in the charge," (*id.*) and then, with the support of Petitioner's counsel (*see id.* at 3915–19), repeated the entire original charge on felony murder, except for the elements of robbery. (*See id.* at 3920–32.)

In the instant case, Petitioner has not demonstrated that the court misstated state law, or that he was denied a right under federal law. The court's supplemental instructions were fair and balanced responses to the jury's questions. After receiving each note, the court heard from counsel, considered their positions, and ultimately settled on focusing the jury's attention on the relevant language in the original charge. Petitioner fails to demonstrate how the court's supplemental instructions were in any way erroneous, misleading, or inappropriate, much less that he was denied due process. Accordingly, this Court recommends that Petitioner's jury instruction claims be dismissed.

**B.** *Right to Be Present At a Material Stage of Trial*

Petitioner claims that he was deprived of his right to be present during a material stage of trial because he was not present during a colloquy in the judge's robing room. Moreover, he argues, the *Allen* charge, which was discussed in his absence, was coercive. (*See* Pet'r Br. at 34–

42.) Respondent argues that, since purely legal matters were discussed, Petitioner did not have a right to be present during the robing room colloquy, and in any event, the court's *Allen* charge was balanced and fair.[1]

"The Due Process Clause and the Confrontation Clause of the Sixth Amendment, as applied to the States via the Fourteenth Amendment, both guarantee to a criminal defendant . . . the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978, 1988, 158 L.Ed.2d 820 (2004)(quoting *Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975)); *see also Rushen v. Spain*, 464 U.S. 114, 138–39, 104 S.Ct. 453, 466, 78 L.Ed.2d 267 (1983). Although the constitutional right to be present is rooted in the Sixth Amendment Confrontation Clause, the Supreme Court has "recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985). However, a defendant's due process right to be present at a proceeding exists only "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)); *see also Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987) (same); *Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir.2002)("[T]here is no constitu-

---

**1.** Although Petitioner failed to register an objection at trial, either through counsel or personally, to his absence from the robing room conference, to the court's decision to issue an *Allen* charge, or to the substance of the *Allen* charge, the Appellate Division appears to have decided his claim on the merits. Respondent does not argue otherwise. Accordingly, this Court will address Petitioner's claims on their merits.

tional right to be present 'when presence would be useless, or the benefit but a shadow.' ") (quoting *Snyder*, 291 U.S. at 106–07, 54 S.Ct. at 332, and citing *Gagnon*, 470 U.S. at 526–27, 105 S.Ct. at 1484); *United States v. Canady*, 126 F.3d 352, 360 (2d Cir.1997) (same).

■ In the instant case, the record indicates that in the judge's robing room, in the presence of the prosecutor and counsel for Petitioner, the court received the following jury note. (*See* Tr. at 3932–34.)

One juror based on the law found the two defendants guilty, but because of moral reasons, he cannot make a guilty decision on the felony murder. Another juror 'goes along with it.' The 10 remaining jurors found the two defendants guilty of felony murder and all twelve jurors found the two defendants guilty on the first degree robbery. Please advise.

(*Id.* at 3932.)

After the court read the note, the prosecutor requested that the court receive the partial guilty verdict on the robbery count, and deliver an *Allen* charge. (*See id.* at 3933.) Approximately thirty minutes later, after Petitioner and his counsel were given an opportunity to confer, the court received the partial verdict from the jury, and after confirming that the jury had not been able to reach a unanimous verdict on the felony murder count, delivered an *Allen* charge. (*See id.* at 3934–47.) Neither Petitioner, nor his attorney, registered any objection to the court receiving the partial verdict, or delivering the *Allen* charge.

It is clear from the record that Petitioner's presence in the judge's robing room could not have contributed to his defense, much less that "his absence frustrate[d] the fairness of the proceedings." *Lane*, 124 S.Ct. at 1988 (quoting *Faretta*, 422 U.S. at 819 n. 15, 95 S.Ct. at 2533 n. 15). The only matter discussed during the conference was the court's response to the jury's deadlock note—a purely legal matter, wholly unrelated to any peculiar factual knowledge that Petitioner might add—which was properly discussed in the presence of Petitioner's counsel, who raised no objection to the court's proposed course of action. Moreover, before the court formally responded to the note in the presence of the jury, Petitioner was afforded an opportunity to confer with his counsel. After Petitioner and his counsel conferred, neither of them availed themselves of the opportunity to object in open court, either to receiving the partial verdict, or to delivering the *Allen* charge. *Cf. United States v. Ronder*, 639 F.2d 931, 934 (2d Cir. 1981)("[i]t is settled law that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds").

Although it is difficult to discern precisely what Petitioner is claiming in regard to the state court's *Allen* charge, he appears to argue that the alleged denial of his due process right to be present at the robing room colloquy was not harmless error because the court's decision to deliver the *Allen* charge was unwarranted, and the charge was coercive. (*See* Pet'r Br. at 40.)

Petitioner's failure to object to the *Allen* charge after hearing it read to the jury belies his contention that its alleged coerciveness could have been averted had he been present at the robing room conference. To the contrary, it supports Respondent's contention that his presence at a conference where purely legal matters were discussed would not have benefitted his defense. Nevertheless, the decision to deliver the *Allen* charge was within the court's discretion, and the charge itself was proper.

■ "It has long been established that when a trial court receives notice that the

jury is deadlocked it may give ... an *Allen* charge, ... urg[ing] the jurors to continue deliberations in order to reach a verdict." *United States v. Henry,* 325 F.3d 93, 106 (2d Cir.2003)(quoting *Smalls v. Batista,* 191 F.3d 272, 278 (2d Cir.1999) in turn citing *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)); *see also Lowenfield v. Phelps,* 484 U.S. 231, 237–38, 108 S.Ct. 546, 551, 98 L.Ed.2d 568 (1988)("[t]he continuing validity of this Court's observations in *Allen* are beyond dispute"). It is within the trial court's discretion to determine when to deliver an *Allen* charge, and the Second Circuit has declined to "circumscribe the trial court's discretion" by drawing "fine lines" as to when the charge is appropriate. *United States v. Hynes,* 424 F.2d 754, 758 (2d Cir.1970); *see also Vichare v. AMBAC Inc.,* 106 F.3d 457, 462 (2d Cir.1996)("[d]ecisions whether and when to give an *Allen* charge are within the discretion of the trial court"); *Campos v. Portuondo,* 193 F.Supp.2d 735, 747–48 (S.D.N.Y.2002). Therefore, in determining whether an *Allen* charge was appropriate, a court must "consider the supplemental charge given by the trial court 'in its context and under all the circumstances.' " *Lowenfield,* 484 U.S. at 237, 108 S.Ct. at 550 (quoting *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965)(*per curiam* )).

> Whether an *Allen* charge was appropriate in a given case hinges on whether it tends to coerce undecided jurors into reaching a verdict. Coercion may be found when jurors are encouraged to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt. Accordingly, a necessary component of any *Allen*-type charge requires the trial judge to admonish the jurors not to surrender their own conscientiously held beliefs.

*Smalls,* 191 F.3d at 278–79 (internal citations and quotation marks omitted); *see*

*also United States v. Mejia,* 356 F.3d 470, 477 (2d Cir.2004)("the standard *Allen* charge ... instruct[ing] ... 'no juror should surrender his or her honest conviction as to the weight or effect of the evidence to his fellow or her fellow jurors or for the purpose of returning a verdict' ... assures that those who have conscientious opinion for *either* side need not yield them in order to assure unanimity")(quoting *Henry,* 325 F.3d at 107; *United States v. Mason,* 658 F.2d 1263, 1268 (9th Cir.1981)("[i]f cases grappling with Allen have a common thread, it is this: the integrity of individual conscience in the jury deliberation process must not be compromised"); *United States v. Robinson,* 560 F.2d 507, 517 (2d Cir.1977)(en banc)("[t]he propriety of an Allen-type charge depends on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts").

◼ In the instant case, the court concluded its *Allen* charge by "stress[ing] that under no circumstances should any of you compromise a conscientiously held individual position that is based on the law and the evidence to reach a unanimous verdict." (Tr. at 3946.) Moreover, in light of the fact that the jury's note suggested unanimity on the facts and the law—one juror "based on the law found the two defendants guilty, but because of moral reasons, he cannot make a guilty decision on the felony murder ... [and] another juror 'goes along with it' " (*id.* at 3932)—the court's instruction that "every good faith effort should be made by you consistent with your conviction to attempt to arrive at a just verdict based on the law and the evidence" (*id.* at 3945–46), properly reiterated the jury's role as fact finders, and was not coercive simply because it expressed a demand for diligent deliberations.

Since Petitioner fails to demonstrate how his presence at the robing room conference would have benefitted his defense, or that his absence in the least bit compromised the fairness of his trial, his right to due process was not violated by his absence from the conference.[2] *See Vellon v. David,* No. 01–CV–6505 (JBW), 03–MISC–0066 (JBW), 2003 WL 23185761, at *8 (E.D.N.Y. Nov.11, 2003)(right to be present is "triggered only when the defendant's 'presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge' ")(quoting *Cohen,* 290 F.3d at 489); *Dickens v. Filion,* No. 02 Civ. 3450(DLC)(AJP), 2002 WL 31477701, at *9 (S.D.N.Y. Nov. 6, 2002)("the Federal Constitution generally 'does not require a defendant's presence at sidebar conferences' ")(quoting *McKnight v. Superintendent Albauch,* No. 97 Civ. 7415(WK), 2000 WL 1072351, at *6 (S.D.N.Y. Aug.2, 2000), in turn quoting *Gaiter v. Lord,* 917 F.Supp. 145, 152 (E.D.N.Y.1996)); *Wilson v. Bennett,* 188 F.Supp.2d 347, 357 (S.D.N.Y.2002)(no due process right to be present at sidebar conference where the petitioner's "absence from the sidebar 'did not affect the court's ability to decide the issue or otherwise diminish [the defendant's] ability to defend against the charges, and [the defendant's] interests were adequately protected by his counsel's presence at the conference' ")(quoting *United States v. McCoy,* 8 F.3d 495, 497 (7th Cir.1993)); *Lou v. Mantello,* No. 98–CV–5542 (JG), 2001 WL 1152817, at *11 (E.D.N.Y. Sept.25, 2001)("[a] jury charge conference and sidebar discussions where only questions of law were addressed are not 'material' "

stages of trial triggering a defendant's right to be present).

Accordingly, there is no basis for this Court to conclude that the state court's determination—that Petitioner was not denied his due process right to be present at a material stage of trial—was an unreasonable application of clearly established federal law.

### C. *Petitioner's Right to Confront Witnesses*

Petitioner claims that he was denied his Sixth Amendment right to confront witnesses against him when the trial court refused to allow his attorney to cross-examine the police officers involved in the shooting about the New York City Police Department's ("N.Y.P.D.") guidelines on the use of deadly physical force. (*See* Pet'r Br. at 53.) Respondent argues that this claim is procedurally barred, and in any event, meritless. (*See* Resp't Br. at 35.)

In a pretrial hearing, Petitioner sought a ruling allowing him to call an expert to testify at trial regarding whether the police officers in this case violated departmental guidelines on the use of deadly physical force. (*See* Transcript from New York Supreme Court, Part 63, New York County, November 18 1993 ("Tr. Prelim. Hr'g I") at 4.) The prosecutor argued that "guidelines set up by the police department to discipline police officers" are not relevant to "assist a jury in determining whether a cop is grossly negligent." (*See id.* at 25.)

**2.** Alternatively, since the *Allen* charge was not objected to and perfectly appropriate, even if Petitioner's right to be present was violated the error was harmless. *See Pellington v. Greiner,* 307 F.Supp.2d 601, 607 (S.D.N.Y.2004)(petitioner's absence from a conference between the court and counsel regarding the proper response to a juror's note was found to be harmless where petitioner's counsel was present at the conference, and petitioner was able to confer with his counsel and raise any objections prior to the jury resuming its deliberations).

On December 3, 1993, the trial court (Andrias, J.) ruled that it was "not inclined to allow expert testimony on the issue of whether the police conduct was an intervening cause." (*See* Transcript from New York Supreme Court, Part 63, New York County, December 3, 1993 ("Tr. Prelim. Hr'g II") at 2.) However, the court continued, "once counsel gets the transcript of the grand jury minutes and/or other discovery, if you choose to have your expert review that matter and summarize what he or she wants to say, you can do that and make your record whether you think it will add or detract from the jury consideration on the issue." Petitioner's counsel responded, "fine, your Honor." (*See id.* at 3.)

Neither Petitioner, nor his co-defendant, ever submitted proposed expert testimony on the issue, nor did they seek to introduce such testimony at trial. However, during cross-examination of officer Bauman, counsel for Petitioner's co-defendant, Daniel Ollen ("Ollen"), asked: "when you were in the Police Academy receiving your training, you were instructed in certain situations when you would be authorized to use deadly physical force against another person, correct?" (Tr. at 2489.) The court overruled the prosecutor's objection to this question. (*See id.*) At the ensuing sidebar, the prosecutor argued that the court had previously ruled that it was not going to allow testimony regarding N.Y.P.D. policies on the use of deadly physical force. (*See id.* at 2490–91.) The court and both defense attorneys were in accord that the court's pretrial ruling only applied to expert testimony on the issue. (*See id.* at 2491–92.)

Ollen explained that he only intended to ask three questions relating to the officer's training in the use of deadly force: "[y]ou were trained on the use of deadly physical force; you can use it if somebody is shooting at you; however, you are not obligated to use it and you are trained not to use it if it would endanger innocent lives." (*Id.* at 2495.) Petitioner's counsel joined in the application. (*See id.* at 2496.) The court ruled that the defense could ask those three questions, and that they could preface them with "[a]s a trained and experienced officer, you would agree." (*Id.* at 2499.) However, the court warned counsel not to inquire into "what his particular training on that issue is, what the law may be or what the regulations may be." (*Id.* at 2500.) The court concluded by asking whether the parties had "[a]ny exceptions or further points?" (*Id.* at 2502.) Neither defense counsel indicated any objection to the court's ruling.

On direct appeal, the Appellate Division held that "[s]ince [Petitioner] acquiesced in the court's compromise ruling and did nothing to alert the court that it had still not provided appropriate relief, [Petitioner] failed to preserve [his] claim that the court improperly precluded cross-examination of a police officer concerning the internal police guidelines on the use of deadly force." *Edwards,* 278 A.D.2d at 152, 717 N.Y.S.2d at 598.

Under New York law, an alleged error is preserved for appellate review where "a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y.Crim. Proc. Law § 470.05(2). The New York Court of Appeals has explained that this rule "require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." *People v. Luperon,* 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 738–39, 647 N.E.2d 1243 (1995).

New York's codified contemporaneous objection rule is a procedural bar that qualifies as an independent and adequate state basis for denying a claim in a federal habeas corpus proceeding. *See Garcia v. Lewis,* 188 F.3d 71, 78–79 (2d Cir.1999) (reaffirming propriety of New York's contemporaneous objection rule, and recognizing that it may constitute an adequate and independent state procedural rule); *Bossett v. Walker,* 41 F.3d 825, 829 n. 2 (2d Cir.1994)(citing N.Y.Crim. Proc. Law § 470.05(2), in support of conclusion that where Petitioner failed to object to jury charge, his claim was procedurally barred); *Fernandez v. Leonardo,* 931 F.2d 214, 216 (2d Cir.1991) ("[i]t is undisputed that [petitioner's] failure to note this objection constituted procedural default under New York law").

Petitioner's counsel did not ask officer Bauman any questions regarding N.Y.P.D. regulations on the use of deadly force, or his training in that area. Instead, he joined in Ollen's request to ask officer Bauman three specific questions, which the court granted. Since Petitioner did not object to the state court's ruling, nor did he indicate any desire to pursue a more detailed line of questioning into the officer's training or knowledge of the N.Y.P.D. regulations, the Appellate Division held that he failed to preserve the issue for review. Accordingly, this Court is barred from considering the claim, *see Dretke v. Haley,* 541 U.S. 386, 124 S.Ct. 1847, 1849, 158 L.Ed.2d 659 (2004); *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989); *Dunham v. Travis,* 313 F.3d 724, 729 (2d Cir.2002), unless Petitioner can demonstrate cause for the default of the claim and prejudice, or that a fundamental miscarriage of justice would result if the court does not consider his claim. *See Dretke,* 124 S.Ct. at 1849; *Coleman v. Thompson,* 501 U.S. 722, 749–50, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640 (1991); *Dixon v. Miller,* 293

F.3d 74, 80–81 (2d Cir.2002); *Reyes v. Keane,* 118 F.3d 136, 138 (2d Cir.1997). "[T]he cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." *McCleskey v. Zant,* 499 U.S. 467, 493–94, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991)(quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)); *see also Bloomer v. United States,* 162 F.3d 187, 191 (2d Cir.1998). Where a "petitioner has failed to establish 'cause,' in other words why he did not raise these claims at the appropriate time and in the appropriate forum, it is unnecessary to make an inquiry into the question of 'prejudice.'" *Bentley v. Scully,* 851 F.Supp. 586, 604 (S.D.N.Y.1994), *vacated on other grounds,* 41 F.3d 818 (2d Cir. 1994); *see also Engle v. Isaac,* 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 1575 n. 43, 71 L.Ed.2d 783 (1982); *Glisson v. Mantello,* 287 F.Supp.2d 414, 421 (S.D.N.Y.2003); *Tor v. Duncan,* No. 01 Civ. 3984(DLC), 2003 WL 22479250, at *4 (S.D.N.Y. Nov.4, 2003).

In the instant case, Petitioner provides no explanation for his procedural default, nor is any cause apparent from the record. In the absence of cause, the Court need not address the issue of prejudice.

Although an exception to the cause and prejudice requirement may be made if necessary to avoid a fundamental miscarriage of justice, *Carrier,* 477 U.S. at 495–96, 106 S.Ct. at 2649; *Engle,* 456 U.S. at 135, 102 S.Ct. at 1575–76; *Dunham,* 313 F.3d at 730, there is nothing in the record to suggest that such exceptional circumstances can be demonstrated here. A fundamental miscarriage of justice occurs only in the extraordinary case "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Dixon,* 293 F.3d at 81 (quoting *Carrier,*

477 U.S. at 496, 106 S.Ct. at 2649). "To establish actual innocence, petitioner must demonstrate that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id.* (quoting *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998), in turn quoting *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995)) (internal quotation marks omitted).

Petitioner does not claim actual innocence, and, based upon the evidence, the jury's verdict was well supported. He therefore cannot demonstrate that a miscarriage of justice would result if his claim is not heard. Accordingly, this Court recommends that this claim be dismissed as procedurally barred.

### CONCLUSION

For the reasons set forth above, this Court respectfully recommends that this habeas Petition be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of a denial of a federal right, this Court recommends that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c)(2); *Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.), *cert. denied,* 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000). I also recommend that the Court certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from its order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Holwell, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Chief Judge Holwell. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

July 12, 2004.